[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 1, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-16235

_____

D. C. Docket No. 04-23223-CV-MGC

JOSE GUEVARA,

Plaintiff-Appellant,

versus

REPUBLIC OF PERU,
MINISTERIO DEL INTERIOR,
ANTONIO KETIN VIDAL,
FERNANDO ROSPIGLIOSI,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(November 1, 2006)**

Before TJOFLAT, CARNES and HILL, Circuit Judges.

CARNES, Circuit Judge:

This appeal presents the issue of whether a foreign state's offer of a reward in return for information enabling it to locate and capture a fugitive falls within the Foreign Sovereign Immunities Act's commercial activity exception to sovereign immunity. For the reasons that follow, we conclude that it does.

**I.**

Vladimiro Lenin Montesinos Torres served as an advisor to Peruvian President Alberto Fujimori and as the head of Peru's National Intelligence System during the 1990s. (Compl. ¶ 8). He is currently in the midst of a series of corruption trials in that country. The allegations are that Montesinos committed a host of crimes while he was in office, including arms trafficking, drug dealing, money laundering, extortion, and more than a few murders. Id. According to declassified documents from the United States Southern Command, the nerve center responsible for this country's military operations in Latin America, Montesinos has "been compared variously to such sinister figures as Rasputin, Darth Vadar, Torquemada and Cardinal Richelieu." United States Southern Command, Information Paper (Jan. 6, 1997). The picture is one of a man who has never been troubled by anything resembling a moral scruple, and the facts about how he was brought to justice form the stage on which this lawsuit plays.

For decades journalists and politicians had been leveling accusations of corruption against Montesinos, but for a long time none of them stuck. Things began to change on the evening of September 14, 2000, when an opposition lawmaker aired on Peruvian national television a video showing Montesinos handing a bribe to a congressman-elect. See Clifford Krauss, Fujimori's Fall, N.Y. Times, Dec. 3, 2000, § 1, at 1.[1] That alone might not have done him in, but as it turned out Montesinos was like a serial killer who relishes the opportunity to relive his crimes—he had videotaped many of his dirty deeds. Id. Peruvian authorities seized from Montesinos more than 700 videotapes incriminating him in a host of crimes. See Jane Holligan, Bribes, Lies, and Videotape in Peru, Bus. Week Online, Feb. 2, 2001. On September 16, 2000, President Fujimori, facing public pressure, announced that he was dissolving the intelligence agency and that he would step down after holding new elections. See N.Y. Times, supra.

Jail time seemed imminent for Montesinos, but the former spy chief was also something of a magician. Over the years he had managed to make many of his enemies, including journalists, disappear, and he had one more magic act up his

---

[1]Because this is an appeal from a Federal Rule of Civil Procedure 12(b)(1) dismissal, the operative facts are those alleged in the complaint. Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990). In this section of the opinion, where outside sources are cited, we have drawn some additional details from them to flesh out the story. Those details, which are entirely consistent with the complaint's allegations, are not essential to our decision. At least at this stage, the parties are at loggerheads over the law, not the facts.

sleeve. Thomas Catan, The Sins of Montesinos, The Fin. Times Mag., July 26, 2003, at 15. In October 2000, Montesinos slipped out of the country on a yacht bound for the Galapagos Islands, sailed on to Venezuela, and visited a plastic surgery clinic. Then he vanished. Id.

An international manhunt ensued. In November of 2000, Peru appointed a special prosecutor to investigate the intelligence system's net of corruption and to see that those involved were convicted and punished. (Compl. ¶ 11). The same month the prosecutor issued national and international arrest warrants for Montesinos. Id. Antonio Ketin Vidal, the Minister of the Interior of Peru, worked with international police agencies to coordinate the search. Id. Despite a media frenzy, the trail quickly grew cold. Fin. Times Mag., supra.

Peru needed to generate new leads. To do so, Interim President Valentin Corazao issued Emergency Decree No. 049-2001, which established a five million dollar reward for accurate information enabling the authorities to locate and capture Montesinos. (Compl. ¶ 12). Article One of that decree provided that Peru thereby:

> Establish[ed] a financial reward in the amount of US $5,000,000.00 (FIVE MILLION 00/100 UNITED STATES DOLLARS), which shall be given to the person or persons who provide(s) accurate information that will directly enable locating and capturing Vladimiro Lenin Montesinos Torres. In the event several persons provide the said information, the financial reward shall be divided among them.

(Compl. Ex. A). Article Three of the decree defined "accurate information":

> For purposes of this Emergency Decree, accurate information shall be that [information] provided through any means to the Special High Level Committee and which enables locating and capturing Vladimiro Lenin Montesinos Torres, who is wanted.

Id. (bracketed word in original)

Enter the plaintiff. Jose Guevara had met Montesinos in Venezuela in mid-December 2000. (Compl. ¶ 15). Montesinos needed a safe-house, and Guevara agreed to provide it. Id. Guevara also provided Montesinos with a security detail, which gave him complete knowledge of the fugitive's whereabouts. (Compl. ¶¶ 15-16).

Guevara was easier to track down than Montesinos. In June 2001, F.B.I. agents located and detained Guevara in Miami. (Compl. ¶¶ 17-18). The agents told him that the United States intended to pursue criminal charges against him unless he gave up Montesinos. (Compl. ¶ 18). They also reminded Guevara of Peru's reward offer. Id. Faced with a choice of jail time and loyalty to Montesinos or five million dollars and freedom, it did not take Guevara long to make up his mind.[2] Guevara not only disclosed Montesinos' hiding place and telephone

---

[2] The apparent ease with which Guevara made the choice to betray Montesinos brings to mind the epitaph an owner put on the tombstone of his departed canine companion: "[O]ne might have thought he was human, but he was loyal." Chiseled Farewells, Harv. Mag., Nov. – Dec. 2002, at 15 (quoting an epitaph on the tombstone of a dog named Pompey, buried in the

number but also arranged to have him delivered into the hands of the Venezuelan intelligence agency. (Compl. ¶ 22). Montesinos was arrested as a result of the information Guevara provided and the assistance he rendered, but for reasons that it has not disclosed in this case Peru has refused to pay him the promised reward. (Compl. ¶ 1).

## II.

Guevara filed this lawsuit in the Eleventh Judicial Circuit of Florida, and it was removed under 28 U.S.C. § 1441(d) to the United States District Court for the Southern District of Florida. The lawsuit claims breach of contract, breach of contract implied in law, fraudulent inducement, and fraudulent misrepresentation. The named defendants include The Republic of Peru; its Ministry of the Interior; Antonio Ketin Vidal, who was the Minister of the Interior at the time of these events; and Fernando Rospigliosi, who succeeded Vidal in that office. The Republic of Peru and the Ministry of the Interior filed a motion to dismiss, contending that they are immune under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602–11. Vidal and Rospigliosi filed a motion to dismiss contending that as agents of the Republic of Peru they are likewise entitled to

---

animal cemetery in London's Hyde Park).

6

sovereign immunity.  The two individual defendants also asserted that the district court lacked personal jurisdiction over them.

In an order entered on October 6, 2005, the district court concluded that Peru's actions did not fit under any exception to the FSIA and therefore both the nation and its Ministry of the Interior were entitled to sovereign immunity.  On October 14, 2005, the court entered another order concluding that Peru's sovereign immunity protected the two individual defendants, who had been acting in their official capacity.  On those bases, the court dismissed the complaint for lack of jurisdiction and denied all other pending motions as moot.

Guevara appealed the judgment dismissing his complaint.  The individual defendants, in addition to urging that we affirm the dismissal on the grounds stated by the district court, have also pressed their position that the district court lacked personal jurisdiction over them.

### III.

### A.

The Foreign Sovereign Immunities Act provides the sole basis for obtaining subject matter jurisdiction over a foreign sovereign in the United States.  Beg v. Islamic Republic of Pakistan, 353 F.3d 1323, 1324 (11th Cir. 2003).  The Act provides a general grant of immunity for foreign governments,  28 U.S.C. § 1604,

7

subject to specific statutory exceptions. The one at issue in this case is the commercial activity exception. 28 U.S.C. § 1605(a)(2). It provides that:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case– . . . (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Id.

Peru contends, and the district court agreed, that offering a reward for capturing a fugitive involves uniquely sovereign objectives, and for that reason does not constitute a commercial activity. Guevara responds that the dispositive issue is whether private actors could similarly offer a reward for information leading to the capture of a fugitive. They can, he says, and it follows that the activity is "commercial" as that term is used in the Act.

B.

To decide this issue we need to mark the boundaries of the "commercial activity" exception as it is used in the FSIA. Examining the text of the Act helps some. It says that "commercial activity" is:

> either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be

8

determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). The Supreme Court has noted that this definition "leaves the critical term 'commercial' largely undefined." Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 612, 112 S. Ct. 2160, 2165 (1992). The problem is that the first sentence "simply establishes that the commercial nature of an activity does not depend upon whether it is a single act or a regular course of conduct; and the second sentence merely specifies what element of the conduct determines commerciality." Id.

The Supreme Court, going beyond the statutory explanation, also determined in Weltover that the FSIA in general, and its commercial exception in particular, "largely codifies the so-called 'restrictive' theory of foreign sovereign immunity." Id. Under the restrictive theory immunity should be granted "only with respect to causes of action arising out of a foreign state's public or governmental actions." Alfred Dunhill v. Republic of Cuba, 425 U.S. 682, 698, 96 S. Ct. 1854, 1863 (1976). By contrast, sovereign immunity does not apply to a foreign state's "commercial and private activities." Id. To understand what this means we turn to an examination of the historical development of sovereign immunity law in this

country, mindful of Holmes' advice that in order to know what the law is we must know what it has been and is becoming.[3]

The FSIA is only thirty years old, but the view of sovereign immunity that it embodies is much older. Originally, the United States recognized only a limited form of sovereign immunity. David J. Bederman, Admiralty and the Eleventh Amendment, 72 Notre Dame L. Rev. 935, 939–40 (1997). More than two centuries ago a federal court applied an exception to foreign sovereign immunity where the foreign power's actions have a "commercial character." Ellison v. The Bellona, 8 F. Cas. 559, 559 (D.S.C. 1798). Early Supreme Court decisions similarly noted that "a clear distinction is to be drawn between the rights accorded to private individuals or private trading vessels, and those accorded to public armed ships which constitute a part of the military force of the nation." The Schooner Exchange v. M'Faddon, 11 U.S. (7 Cranch) 116, 143 (1812); see also The Santissima Trinidad, 20 U.S. (7 Wheat.) 283, 353 (1822).

This dichotomy between public and sovereign versus private and commercial fits the original figure Chief Justice Marshall used to explain the principle underlying the commercial exception to immunity—that of a sovereign

---

[3]See Oliver Wendell Holmes, Jr., The Common Law 1 (Boston, Little, Brown & Co. 1881) ("In order to know what it is, we must know what it has been, and what it tends to become. . . . The history of what the law has been is necessary to the knowledge of what the law is.").

"descending" to the level of a private individual. See Bank of the United States v. Planters' Bank of Ga., 22 U.S. (9 Wheat.) 904, 907 (1824) ("It is, we think, a sound principle, that when a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted."). A state not acting in its unique role as sovereign is akin to a private citizen or merchant.

Although Schooner Exchange anticipated exceptions to immunity for private commercial activity, by the 1920s the decision had nonetheless "c[o]me to be regarded as extending virtually absolute immunity to foreign sovereigns." Verlinden B.V. v. Cent. Bank of Nig., 461 U.S. 480, 486, 103 S. Ct. 1962, 1967 (1983); see, e. g., Berizzi Bros. Co. v. S.S. Pesaro, 271 U.S. 562, 571, 46 S. Ct. 611, 611 (1926). Over the next two decades, the Court shifted to a policy of deference toward the executive branch. See, e.g., Republic of Mexico v. Hoffman, 324 U.S. 30, 34, 65 S. Ct. 530, 532 (1945) ("Chief Justice Marshall introduced the practice, since followed in the federal courts, that their jurisdiction in rem . . . will be surrendered on recognition . . . of the asserted immunity by the political branch

11

of the government charged with the conduct of foreign affairs . . .”); Ex parte

Republic of Peru, 318 U.S. 578, 588, 63 S. Ct. 793, 799 (1943) (same); Compania

Espanola de Navegacion Maritima, S.A. v. The Navemar, 303 U.S. 68, 74, 58 S.

Ct. 432, 434 (1938) (same).  This deferential approach did not change the existing

practice of granting sovereign immunity in virtually all cases where it was claimed,

because the executive regularly requested that the courts grant immunity to all

friendly foreign sovereigns.  Verlinden, 461 U.S. at 486, 103 S. Ct. at 1968.

In 1952 the State Department changed the executive’s policy to one

embodying the restrictive theory of sovereign immunity.  The department first

signaled this shift in policy in a letter from Jack B. Tate, Acting Legal Adviser,

United States Dept. of State, to Philip B. Perlman, Acting Attorney General. (May

19, 1952), as reprinted in 26 Dept. of State Bull. 984–85 (1952).  Tate wrote in

part:

> A study of the law of sovereign immunity reveals the existence of two
> conflicting concepts of sovereign immunity, each widely held and
> firmly established.  According to the classical or absolute theory of
> sovereign immunity, a sovereign cannot, without his consent, be made
> a respondent in the courts of another sovereign.  According to the
> newer or restrictive theory of sovereign immunity, the immunity of
> the sovereign is recognized with regard to sovereign or public acts
> (jure imperii) of a state, but not with respect to private acts (jure
> gestionis).  . . . it will hereafter be the Department’s policy to follow
> the restrictive theory of sovereign immunity in the consideration of
> requests of foreign governments for a grant of sovereign immunity.

12

Id.; see also Alfred Dunhill, 425 U.S. at 698, 96 S. Ct. at 1863 (explaining that the position taken in the Tate Letter became the official policy of the United States government). This new restrictive approach also required the State Department to make case-specific immunity recommendations for each lawsuit against a foreign state, and that proved problematic. See Verlinden, 461 U.S. at 487, 103 S. Ct. at 1968. Congress resolved this problem, at least for the executive branch, by enacting the FSIA, shifting the burden of making immunity determinations to the judicial branch. 28 U.S.C. § 1602 (stating that the determination of immunity by the courts would "serve the interests of justice").

Although the FSIA transferred the job of making initial immunity determinations from the State Department to the United States courts, it retained the restrictive theory of immunity. The House Report accompanying the bill that was ultimately enacted explained that:

> the bill would codify the so-called "restrictive" principle of sovereign immunity, as presently recognized in international law. Under this principle, the immunity of a foreign state is "restricted" to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis).

H.R. Rep. No. 94-1487, at 6 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6605.

The case law governing foreign sovereign immunity and the legislative history of the FSIA both treat commercial and private activity as outside the

13

bounds of sovereign immunity.  See, e.g., Alfred Dunhill, 425 U.S. at 698, 96 S. Ct. at 1863 ("commercial and private activities . . . do not give rise to sovereign immunity"); The Schooner Exchange, 11 U.S. (7 Cranch) at 143 ("[A] clear distinction is to be drawn between . . . private individuals or private trading vessels, and . . . public armed ships."); H.R. Rep. No. 94-1487, at 6 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6605 ("[T]he immunity of a foreign state is 'restricted' to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis).").

Commercial activities and private activities are often spoken of together and in a way that distinguishes them from sovereign or public acts.  See, e.g., Weltover, 504 U.S. at 613, 112 S. Ct. at 2166 (noting "the distinction between state sovereign acts, on the one hand, and state commercial and private acts, on the other");  Letter from Jack B. Tate, Acting Legal Adviser, Dept. of State, to Philip B. Perlman, Acting Attorney General (May 19, 1952), as reprinted in 26 Dept. of State Bull. 984–85 (1952) ("[t]he immunity of the sovereign is recognized with regard to sovereign or public acts (jure imperii) of a state, but not with respect to private acts (jure gestionis)."); H.R. Rep. No. 94-1487, at 6 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6605.

It is against this historical and legislative backdrop that the Weltover court announced the rule for determining whether an activity is commercial: "[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." 504 U.S. at 614, 112 S. Ct. at 2166. The Court explained:

> [B]ecause the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," 28 U.S.C. § 1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce," Black's Law Dictionary 270 (6th ed. 1990)

Id.

Our first extended discussion of the Weltover decision came in Honduras Aircraft Registry, Ltd. v. Gov't of Honduras, 129 F.3d 543 (11th Cir. 1997), where we stated that a "foreign state loses its immunity if it engages in commercial activity . . . because then it is exercising the same powers that a private citizen might be exercising." Id. at 548. We read Weltover to mean that "[a] foreign state is commercially engaged when it acts like an ordinary private person, not like a sovereign, in the market." Id.

The Honduras case involved a contract entered into by that country and the plaintiff, a corporation founded by two businessmen with airline experience, for

15

the provision of goods and services Honduras needed to upgrade and modernize its civil aeronautics program. Id. at 545. The plaintiffs' responsibilities included establishing a database containing information that Honduras needed to admit airplanes to its registry. Id. When its leadership changed, Honduras abrogated the contract. After being haled into a United States court by the plaintiff, Honduras invoked sovereign immunity, arguing that the registration of aircraft is a sovereign act. Id. at 546.

While we agreed with Honduras that "registering aircraft under the Honduras flag is an act peculiar to its sovereignty," we nonetheless concluded that its contracting for services was a commercial act. Id. at 548. As we explained, "[a]pparently Honduras did not have the resources or the technical expertise to conduct its own aircraft inspections or to set up a registry," so it "ventured into the marketplace to find the expertise and resources needed to accomplish those tasks." Id. at 547. The plaintiffs did not contend that the contract gave them the right to register aircraft or force Honduras to do so, but instead took the position that they had contracted to provide services in connection with registration and were bringing suit to enforce that contract. Id. at 548. We agreed, because "[a]ll of those underlying activities were commercial in nature and of the type negotiable among private parties." Id. at 547.

C.

The location and capture of a fugitive by law enforcement officials of a country may be a sovereign act, but that is not what this case is about. Peru's contractual offer of a reward did not promise that in return for the information it was seeking Peru would locate and capture Montesinos, and Guevara is not seeking to compel it to do so. All that Guevara is seeking is what Peru promised in the reward offer, which is that it would pay five million dollars to anyone who furnished information of the nature and quality that enabled Peru to capture Montesinos. The information that Guevara provided fit the requirements of the offer: it enabled Peru to capture Montesinos. The question in this appeal is whether Guevara can use the courts of this country to compel Peru to keep its contractual promise to pay him the money it offered.

The facts here are similar enough to those in the Honduras case to compel the same result. Just as Honduras could have attempted to develop its aircraft database in-house without offering money for the assistance of anyone outside the government, Peru could have attempted to use its police and investigatory powers to search for Montesinos without offering money for information from anyone outside the government. However, Peru "did not have the resources or the . . . expertise," Honduras, 129 F.3d at 547, it needed to get the job done. After the trail

17

ran cold, Peru "ventured into the marketplace," id., to buy the information needed to get its man. Id. Guevara provided that information for a price, the price being the five million dollars that Peru had offered to pay for it. The underlying activity at issue—the exchange of money for information—is "commercial in nature and of the type negotiable among private parties." Id.

Peru attempts to distinguish Honduras by arguing that here "[t]he sovereign act of capturing Montesinos [was] a condition precedent to the earning of the reward." (Br. Of Appellee at 8) On that basis it would have us conclude that the "sovereign act of capture was the 'nature' of the transaction." Id. at 7. Both the premise and the conclusion of Peru's argument are false.

The premise of the argument is false because the contract did not contain a condition precedent requiring Montesinos' capture. Article One of the emergency degree specifies that the reward "shall be given to the person or persons who provide(s) accurate information that will directly enable locating and capturing Vladimiro Lenin Montesinos Torres." (Compl. Ex. A) (emphasis added). Article Three specifies that accurate information shall be that "which enables locating and capturing Vladimiro Lenin Montesinos Torres." Id. (emphasis added) This condition describes the extent and quality of the information that an informant must provide to qualify for the reward. It does not require an actual capture.

18

"Enable" means "to make able; give power, means, competence, or ability to; authorize" or "to make possible or easy."  Random House Unabridged Dictionary 639 (2d ed. 1983).  Guevara satisfied the condition when he provided information sufficient to "make able" or "make possible" the capture of Montesinos.  The information he provided enabled the capture when he provided it;  it did not become enabling only after Peru took Montesinos into custody.

Although Peru issued the Emergency Decree in Spanish, we think that little has been lost in translation.  Article One uses a conjugated form of the verb "permitir," which means "to permit" or "to allow."  Harrap's Concise Spanish 383 (1991).  Article Three uses "posibilitar," which means "to make possible" or "to facilitate."  Id. at 397.  Peru was not offering a reward in return for Montesinos' capture; it was offering a reward in return for information of sufficiently high quality to enable his capture.  It is true that Article Seven provides that Peru "shall pay the Financial Reward 24 hours after the actual location and capture of . . . Montesinos."  (Compl. Ex. A).  While this clause could be read as a condition precedent requiring capture, it appears primarily intended to induce acceptance of the reward offer by promising timely payment.

Put another way, if Guevara had offered up every single bit of information Peru could possibly desire about how to locate and capture Montesinos, but Peru

19

had a sudden change of heart and decided to let Montesinos remain free, we think that Guevara still would have satisfied his end of the bargain. Peru's own website describing the Emergency Decree best explains the document's terms: "The basic condition is to give true information to make possible the location and capture of Vladimiro Montesinos Torres." Id. Guevara did that, and Peru used the information to capture Montesinos.

Even if the capture of Montesinos were a condition precedent, Peru's assertion that conditions necessarily (or even typically) alter the "nature" of a contract is mistaken. The core of a contract is the parties' performance obligations, what they bargained for. Conditions fix the timing of the parties' performance obligations or make them contingent. The occurrence of a condition may be beyond the parties' control, but that does not alter the nature of the contract. For example, an oil company might enter into a contract with a freight company to ship oil from Turkey to the United States conditioned on the oil company receiving an export license from the government of Turkey. Although the condition – the granting an export license – is a sovereign act, see MOL, Inc. v. Peoples Republic of Bangladesh, 736 F.2d 1326, 1328–29 (9th Cir. 1984), the contract is still one for the shipment of oil, which is quintessentially commercial.

20

The same principle applies if one of the parties is a sovereign state. Suppose that a country contracts to buy bullets from a private manufacturer. We know that transaction would be a commercial activity because the Supreme Court has said so. Weltover, 504 U.S. at 614, 112 S. Ct. at 2166 ("[A] contract to buy army boots or even bullets is a 'commercial' activity."). If the country conditioned the contract on it declaring war on a neighbor before the scheduled date of delivery, we would still have a commercial contract under which, if war is declared, the private party is obligated to supply bullets and the country would be obligated to pay for them. The condition precedent of a declaration of war speaks to the purpose or motivation for buying the bullets, but it does not change the commercial nature of the acts of purchasing and paying for them. Enforcing the contract would not impinge on sovereignty, because it would not force the country to declare war or to refrain from doing so.

We think that information about a fugitive's whereabouts is to a war on crime as military supplies are to a more traditional war. Both commodities are useful to a state's performance of a sovereign function, but a contract for the purchase of either does not require the state to perform a sovereign function. In both situations performance of the contract by the private party enables the state to engage in a sovereign function if it wishes, but does not mandate that it do so.

What it mandates is that the state pay the promised amount for the other party's performance. Paying an amount owed under a contract is not itself a sovereign act.

Conditions precedent stem from the motivation for a contract, rather than from its nature. Parties insert conditions precedent as insurance against frustration of purpose. If a general contractor only needs the services of a subcontractor if it wins the bid on a construction contract, it conditions the use of the subcontractor's services on the outcome of the bidding. Because Peru only wanted to pay for information about Montesinos sufficient to enable his capture, Peru framed its offer in those terms. Although capturing Montesinos may have been critically important to Peru and to its obligation under the contract, it is not critically important to our sovereign immunity analysis. The FSIA tells us that "[t]he commercial character of an activity shall be determined by reference to the nature of the . . . act, rather than by reference to its purpose." 28 U.S.C. § 1603(d); see also Weltover, 504 U.S. at 614, 112 S. Ct. at 2166. If there is a condition precedent present here, it speaks to Peru's purpose, instead of to the nature of the contract.

Peru next contends that its offer of a reward cannot be "commercial" as that term is used in FSIA because there "is no marketplace in which private persons apprehend or capture individuals." (Br. Of Appellee at 9) In fact, there is. Not

22

only that but the oldest American decision recognizing a commercial activities exception to sovereign immunity involved a reward for capture. In 1798 the District Court of South Carolina held that a ship flying under the flag of a foreign state could not claim sovereign immunity in a wage dispute where the wages it owed the seamen were paid as a reward for each ship captured, a fact that was "decisive of the commercial character" of the vessel. The Bellona, 8 F. Cas. at 559.

While the days of prize ships have passed, private individuals still can and do offer rewards for information leading to the capture of fugitives. For example, popular talk show host Oprah Winfrey recently offered up to $100,000 for information leading to the capture of fugitive child predators. See Oprah Winfrey Helps The FBI Get Its Man, Wash. Post, Oct. 8, 2005 at C7. Winfrey has already paid at least three such rewards. See Stella Foster, Stella's Column, Chi. Sun-Times, Jan. 17, 2006, at 56. O.J. Simpson notoriously offered a reward for information leading to the arrest of his ex-wife's "real killers." See Paul Lieberman, Simpson Won't Get Police Help in Search for Killer, L.A. Times, Oct. 5, 1995, at A1. And, of course, private bail-bonding companies frequently offer rewards for information leading to the capture of bail jumpers. The question is whether Peru's offer of a reward for information is the kind of thing that private

23

parties do. The answer is that Oprah did it, O.J. did it, and bail bondsmen do it regularly.

Concerned about the effect of the bail bondsmen analogy on its position, Peru argues that "[w]hen a bailbondsman physically apprehends an individual, the bondsman does so as subrogee of the sovereign's authority." (Br. of Appellee at 11). Peru's point, apparently, is that when a bondsman arrests a fugitive he is acting as an agent of the sovereign. That argument does not help Peru much, if at all. If a bail bondsman offered a reward for information enabling the location and capture of a fugitive who had skipped out on a bond, he could not successfully defend a lawsuit seeking to collect on the reward by asserting sovereign immunity. If an agent acting for the sovereign could not successfully claim sovereign immunity, the sovereign could not either.

That Peru's offer of a reward for information enabling the capture of a fugitive is the kind of thing that private parties do becomes even more obvious when we properly characterize the market at a higher level of generality. In Weltover, the Supreme Court broadly characterized a contract for the purchase of bullets as a "sales contract[]." 504 U.S. at 614, 112 S. Ct. at 2166. In Honduras, we characterized the contract as one designed "to provide goods and services." 129 F.3d at 548. What we have here is a contract to purchase information, and in

24

our information age such contracts are a common staple of the private sector. Peru's attempt to lower the level of generality from a contract for the sale of information down to one of reward for information leading to the capture of a fugitive focuses on the purpose instead of the nature of the transaction.

Contracts for the purchase of information are ubiquitous in the marketplace. Marketing companies offer college students a few dollars, or a product worth that much, for completing surveys. Nonprofit groups pay market research firms for each name added to a targeted mailing list. Apartment complexes and fitness clubs offer referral bonuses for those who provide the names of friends and associates who may be looking for a place to live. A plethora of internet sites offer for sale information about the arrest record, litigation history, and location of everyone with a name and some kind of number to go with it. (Think LexisNexis.) Credit reporting agencies sell tens of millions of dollars of information about consumers and businesses to other businesses each year. There is nothing sovereign about buying and selling information.

Finally, Peru contends that even if a private individual can engage in an activity, it does not mean that the activity is commercial. It accuses Guevera of "equat[ing] private activity with commercial activity," (Br. of Appellee at 11), but this equation is hardly novel. Several centuries of case law, the Tate Letter, and

25

the legislative history of the FSIA also use those terms interchangeably.  Still, the term codified in the act is "commercial activity," and we agree with Peru that there is a realm of private activity that cannot fairly fall within any meaning of the word "commercial."  But we do not agree with Peru's proposal about how we should stake off that realm.

Peru proposes that "commercial activity" includes only that which is "done for a profit motive."  Id. at 12.  We decline to adopt that test because the Supreme Court has instructed us that the FSIA "unmistakably commands" that we consider the nature, rather than the purpose, of a transaction, Weltover, 504 U.S. at 617, 112 S. Ct. at 2167, and a "motive" test treads too closely to an examination of "purpose."

Peru points out that while the text of the Act prohibits an inquiry into the government's actual motive for a particular act, it does not forbid us from imagining why a private person might engage in similar conduct.  We could, Peru says, imagine that a hypothetical private party was performing an identical activity as the government and then inquire into whether that hypothetical party had a profit motive.  We see no reason to do so, because this type of inquiry is not supported by the text of FSIA or by precedent.  It would be inconsistent with the language of the Act and the Supreme Court's instruction that motive not be

26

considered. It is also unnecessary, because the Weltover test already screens out non-commercial acts.

While the FSIA does not state that all commercial activities must have a profit motive, the legislative history of the Act does establish that all activities carried on for a profit are commercial. H.R. Rep. No. 94-1487, at 16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6615. But saying that for-profit activities are commercial is not the same thing as saying that all commercial activities are for profit. The premise that all A is B does not logically compel the conclusion that all B is A, unless A and B are the same thing. There is no reason in the FSIA to believe that commercial activity means the same thing, and no more than, for-profit activity. Some activities that are not carried on for a profit may nonetheless constitute commercial acts. As the House Report explains:

> Certainly, if an activity is customarily carried on for profit, its commercial nature could readily be assumed. At the other end of the spectrum, a single contract, if of the same character as a contract which might be made by a private person, could constitute a "particular transaction or act."

Id. Reducing the meaning of commercial activity to that motivated for profit excludes what the House Report referred to as "the other end of the spectrum," contracts "of the same character as a contract which might be made by a private person," even if not made for profit. Id.

27

Adopting Peru's position that an activity is not commercial unless it is for profit would also conflict with the Weltover decision. That decision establishes that a government contract to buy bullets is commercial, even though most private individuals do not buy bullets for profit. See 504 U.S. at 617. In fact, when private individuals purchase goods and services, they rarely do so with the intent to profit from their purchase. (Think of consumers at grocery stores and gas stations.) Peru's test would exclude most cases in which the government acts as a purchaser, rather than a vendor, of goods and services because most purchases made by private persons are not made with the intent to resell for profit. Nothing in the restrictive theory of sovereign immunity turns on whether the government is a buyer or a seller. Instead, the critical distinction is whether the government is acting in its capacity as sovereign or if it is acting as any private individual might act.

We think that the Weltover test already provides an effective mechanism for filtering out private yet non-commercial activities. The test applies to suits "based upon a foreign state's participation in the marketplace in the manner of a private citizen." Weltover, 504 U.S. at 614, 112 S. Ct. at 2166 (emphasis added). It distinguishes between cases where a foreign government acts "as regulator of a market," which are not within the exception to sovereign immunity, and those

28

where it acts "in the manner of a private player within" that market, which are. <u>Id.</u> When it issued the offer contained in the Emergency Decree, Peru entered the marketplace of information. It did so not as a regulator but as a purchaser in the manner available to any private individual, and that makes its actions commercial.

Although our decision is not based on policy grounds, we think it worth noting that this is an instance in which the result the law requires coincides with good policy. Accepting Peru's position, dressed though it is in the clothing of sovereignty, would frustrate rather than further the ability of countries to carry out their sovereign functions. Anything that makes it easier for countries to welch on their promises to pay for information decreases the real value of any reward they offer and makes it less likely that an offer will be accepted. As Guevara has learned up to this point in the litigation, the promise of a multimillion dollar reward means little or nothing to an informant if the country offering the reward cannot be made to pay it. The holding Peru asks us to reach would jeopardize not only its vital interests but those of every country that offers rewards for information, including this country.

The United States has a number of statutes that authorize the executive branch to offer rewards for information useful in combating terrorism, espionage, international narcotics trafficking, violations of international humanitarian law, and

29

other criminal acts. See, e.g., 18 U.S.C. §§ 3071–77 (authorizing the Attorney General to offer rewards for information leading to the arrest of individuals engaged in terrorism or espionage); 22 U.S.C. § 2708 (granting the Secretary of State discretion to pay rewards for information leading to the arrest of individuals engaged in international terrorism or narcotics-related offenses); Pub. L. No. 105-323, 112 Stat. 3029, 3032 (amending 22 U.S.C. § 2708 to extend it to cover serious violations of international humanitarian law relating to the former Yugoslavia); Pub. L. No. 106-277, 114 Stat. 813 (extending Pub. L. No. 105-323 to cover serious international humanitarian crimes in Rwanda); Pub. L. No. 108-106, 117 Stat. 1209, 1223 (authorizing rewards for information concerning an indictee of the Special Court for Sierra Leone). These reward programs have been successful. Under them the government has paid out at least $47 million since September 11, 2001. Kevin Whitelaw, Just a Phone Call Away, U.S. News & World Rep., Jan. 31, 2005, at 23. Success stories include the location and capture (killing) of Saddam Hussein's sons, Uday and Quasay Hussein, and the capture of Ramzi Yousef, one of the 1993 World Trade Center bombers. Id.

The FBI and CIA used a reward offer to nab one of the most nefarious spies in this country's history. For as long as three decades, a mole high in the American intelligence community, code-named "Graysuit," passed on to the KGB some of

30

this country's most closely held secrets. Louis J. Freeh, My FBI 237 (2005). A "huge team of CIA and FBI officers and agents" worked to uncover the traitor's identity but without success. Id. Finally, Louis Freeh, the Director of the FBI and George Tenet, the Director of Central Intelligence, came up with a plan to offer a "seven-figure payment" for his identity. Id. at 238. The reward offer was aimed at retired senior KGB intelligence officials. Id. One of them accepted the offer. Id. at 239. In return for "several million dollars plus other considerations" he turned over to the CIA and FBI a box full of files and information on Graysuit, which he somehow managed to smuggle out of Lubyanka, the infamous KGB headquarters. Id. With that critical information Graysuit was identified as a highly placed FBI agent named Bob Hanssen. Id. at 240. He was arrested, convicted, and sentenced to life imprisonment. Michael Killian, FBI Spy Hanssen Gets Life, Apologizes, Chi. Trib., May 12, 2002, at 1.

Had the KGB agent who accepted the reward offer in the Hanssen case had reason to doubt whether the United States would pay as promised, he would not have risked his life to provide the information that he did, information that was vital to this country's national security interests. The same is true of those who provided the information that enabled United States to corner Uday and Quasay Hussein and to capture Ramzi Yousef. None of the statutes that authorize the

31

United States government to offer and pay rewards contains a waiver of sovereign immunity, but reward offers are only as effective as they are enforceable. Enforceable commitments are important to reward programs, which are in turn important to the sovereign interests of this and other countries. Absent a clear requirement in the FSIA, we will not create impediments to the enforcement of reward contracts entered into by this or any other country.

## IV.

Guevara contends that the district court erred in finding that Vidal and Rospigliosi, the individual defendants, acted within the scope of their authority as officials of Peru in offering the reward. The FSIA does not expressly provide immunity to individuals acting on behalf of a foreign state. Nonetheless, several circuits have found that such immunity extends to state officials acting in their official capacity. See, e.g., Velasco v. Gov't of Indonesia, 370 F.3d 392, 398 (4th Cir. 2004); Keller v. Cent. Bank of Nig., 277 F.3d 811, 815 (6th Cir. 2002); El-Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996); Chuidian v. Phil. Nat'l Bank, 912 F.2d 1095, 1103 (9th Cir. 1990). However this right is derivative; courts provide individual immunity because "[t]he rule that foreign states can be sued only pursuant to the specific provisions of sections 1605–07 would be vitiated

32

if litigants could avoid immunity simply by recasting the form of their pleadings." Chuidian, 912 F.2d at 1102. That logic does not apply where the sovereign itself is not entitled to immunity. There is no present need to review the district court's conclusion that the individual defendants were acting within the scope of their authority. Even if they were, they are not entitled to sovereign immunity because the sovereign itself is not.

The individual defendants contend that we ought to affirm the judgment dismissing them from the lawsuit anyway, on the ground that the district court lacked personal jurisdiction over them. The district court, having found that they were entitled to sovereign immunity, dismissed their challenge to personal jurisdiction as moot. That result followed from the district court's conclusion that the defendants were immune under the FSIA, which limits the subject matter jurisdiction of the federal courts. 28 U.S.C. § 1604 (stating that if the Act applies, "a foreign state shall be immune from the jurisdiction of the courts of the United States"). "[A] court should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings." Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999). If the court finds that it does not have subject matter jurisdiction, "the court's sole remaining act is to dismiss the case for

lack of jurisdiction." Morrison v. Allstate Indem. Co., 228 F.3d 1255, 1261 (11th Cir. 2000).

Because we disagree with the district court that the FSIA bars Guevara's suit, the individual defendants' motion to dismiss for lack of personal jurisdiction is again relevant. However, the district court should have the first opportunity to resolve it. Defendants cite SEC v. Chenery Corp., 318 U.S. 80, 88, 63 S. Ct. 454, 459 (1943), for the proposition that we must affirm the decision of a district court if it reached the correct result but for the wrong reason. The Chenery case notes that this rule does not apply "where the correctness of the lower court's decision depends upon a determination of fact." Id. Our own decisions are to the same effect. See Pacheco de Perez v. AT&T Co., 139 F.3d 1368, 1372 n.5 (11th Cir. 1998) ("We are mindful of the general rule that a court of appeals will not consider issues not reached by the district court, especially where the issues involve questions of fact."); Stewart v. Dep't of Health and Human Servs., 26 F.3d 115, 115–16 (11th Cir. 1994) (same). The "minimum contacts" prong of the personal jurisdiction inquiry is necessarily case and fact specific. We decline to take up that issue without the benefit of factfindings from the district court. Vidal and Rospigliosi may reassert on remand the issue of the district court's jurisdiction over their persons.

**REVERSED and REMANDED.**