[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14728

_____

GLOBAL MARINE EXPLORATION, INC.,

Plaintiff-Appellant,

*versus*

REPUBLIC OF FRANCE,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:20-cv-00181-AW-MJF

_____

Before LAGOA, BRASHER, and TJOFLAT, Circuit Judges.

LAGOA, Circuit Judge:

This case arises out of the discovery of several shipwrecks found off the coast of Cape Canaveral, Florida, including *La Trinité,* the flagship of the 1565 fleet of the Royal Navy of France, which was captained by Jean Ribault. In 1565, Ribault was dispatched by the French Admiral Gaspard II de Coligny to reinforce the French Huguenot settlement of Fort Caroline located on the St. Johns River near what is now Jacksonville, Florida. The Spanish, however, also laid claim to what they called La Florida, and Pedro Menéndez de Avilés had founded the Spanish settlement of St. Augustine near the French Fort Caroline. King Phillip II of Spain ordered Menéndez de Avilés to destroy the French settlement. Following a skirmish at the mouth of the St. Johns River with Spanish ships, Ribault left in pursuit of the Spanish flagship, the *San Pelayo*. Ribault encountered a hurricane which destroyed his fleet and drove Ribault and his surviving crew members ashore. That same hurricane allowed Menéndez de Avilés to succeed in capturing Fort Caroline after an overland expedition from St. Augustine. After Fort Caroline was destroyed, no further French settlements were established in Florida.

Global Marine Exploration, Inc. ("GME"), conducts marine salvage activities and discovers historic shipwreck sites in Florida's coastal waters. GME entered into authorization agreements with the Florida Department of State, Division of Historical Resources ("FDOS"), to conduct salvage activities in Florida coastal waters off

Cape Canaveral.  Following a 2015 agreement between GME and FDOS, GME discovered several shipwreck sites and informed FDOS of its discovery.  Soon after, however, GME learned that FDOS was in contact with the Republic of France to recover the shipwreck sites, assuming that one of the sites was *La Trinité*. GME subsequently filed an *in rem* admiralty action against the "Unidentified, Wrecked and (for Finders-Right Purposes) Abandoned Sailing Vessel" in federal court.  FDOS and France became parties to that action, and the Middle District of Florida concluded that the identity of the *res* was *La Trinité* and that *La Trinité* is France's sovereign property.  GME did not appeal the *in rem* action. *See Glob. Marine Expl., Inc. v. Unidentified, Wrecked & (for Finders-Right Purposes) Abandoned Sailing Vessel* ("*GME I*"), 348 F. Supp. 3d 1221 (M.D. Fla. 2018).

Following *GME I*, GME sued France, alleging claims for an *in personam* lien award, unjust enrichment, misappropriation of trade secret information, and interference with its rights and relations.  France moved to dismiss GME's amended complaint under Federal Rule of Civil Procedure 12(b)(1), arguing that the district court lacked subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–11, and that the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2), was inapplicable.  The district court agreed with France, finding that the FSIA's commercial activity exception did not apply, and dismissed GME's claims.  GME now appeals the district court's

dismissal, contending that France engaged in commercial activity such that the FSIA's commercial activity exception applies.

For the reasons discussed below, and with the benefit of oral argument, we conclude that the FSIA's commercial activity exception applies. Accordingly, we reverse the district court's Rule 12(b)(1) dismissal and remand for further proceedings.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

GME is a Florida corporation that conducts marine salvage activities and discovers historic shipwreck sites in Florida's coastal waters. GME conducts its salvage activities under authorization agreements with FDOS. In these agreements, Florida granted GME a fixed-term "cultural resource recovery easement for salvage exploration and operational purposes" on Florida-owned submerged lands, as well as permits for GME to use those submerged lands and navigable waters for construction work. GME then "undertook prolonged and expensive research, survey, reporting, and identification of shipwrecked sites," including artifacts, "with reasonable investment-backed expectation[s] and program assurances that its salvage activity" would be fully compensated in line with the value of the discovered sites. In doing so, "GME expended millions of dollars and enormous time and effort."

In 2014, FDOS and GME entered into six agreements governing salvage activity for six different, three-square mile areas off the coast of Cape Canaveral. On August 14, 2015, FDOS and GME entered into a seventh agreement—designated as Permit No. 2015-

03—authorizing GME to survey another designated three-square mile area off Cape Canaveral and to locate and report any shipwreck sites discovered. GME discovered five separate shipwrecks and six historic shipwreck sites in this designated area, and GME's mapped conclusions of the area were provided as part of its report and request to FDOS for approval to proceed with recovery. GME also excavated small artifact items (and took photos and videos as identification of other monuments) from one of the shipwreck sites. GME provided FDOS with the photos and videos. And FDOS directed GME to submit the location coordinate information incident to the agency's oversight and inventory of historical resources division. According to GME, the coordinate information would remain confidential and would be commercially used only by GME.

At some point, GME learned that FDOS was "collaborating and negotiating" with France to recover the shipwreck sites discovered by GME without its involvement, as FDOS and France believed that the shipwreck was France's *La Trinité*—the flagship of the 1565 fleet of the Royal Navy of France that sank during a hurricane off the coast of Florida. Concerned by this development, GME filed the *in rem* admiralty action—*GME I*—in September 2016, and FDOS and France became parties to that action. *See* 348 F. Supp. 3d at 1224. In connection with filing that *in rem* action, GME deposited with the district court several small artifacts (e.g., ballast stones) from the site.

The next month, FDOS demanded GME turn over those same artifacts to it, suspended GME's salvage activity permit, and prohibited GME from proceeding with full recovery of the discovered shipwreck sites. The *GME I* district court later conferred temporary *in rem* custody to FDOS and precluded any shipwreck recovery pending its decision. Ultimately, the *GME I* district court granted France's motion to dismiss the action for lack of subject matter jurisdiction because it concluded that the *res* at issue was *La Trinité*, which was France's sovereign property. *See id.* at 1242. GME did not appeal that order.

Following *GME I*, France and FDOS entered into a "Declaration of Intention Between the State of Florida and the Republic of France On the shipwrecks of Jean Ribault's fleet"(the "Declaration of Intent"). The Declaration of Intent stated that, as a result of the district court's decision in *GME I*, France was authorized "to begin recovery operations" of *La Trinité* and that the signatories would cooperate "concerning research on, and protection and preservation of" *La Trinité*. FDOS and France further agreed to: (1) protect the shipwreck sites "to prevent any form of plundering"; (2) recover the shipwreck sites and present those discoveries to the public in Florida, e.g., through exhibitions or publications; (3) promote the common history of the United States and France in Florida; and (4) identify, evaluate, mobilize, and oversee resources and organizations to fulfill the Declaration of Intent's objectives. The Declaration of Intent also established a steering committee to implement the agreement.

In April 2020, GME sued France, alleging that "France is sending missions to Florida to oversee the project and provide scientific expertise" under the Declaration of Intent and that "work is on-going." GME also asserted that France was performing commercial activity in Florida through France's agreement with FDOS and others, "and by activities undertaken or to be undertaken, in relation to GME's discovered shipwreck sites for which GME claims rights and interest."

GME asserted four claims against France: (1) an *in personam* salvage lien; (2) "quasi contract/unjust enrichment"; (3) misappropriation of GME's trade secret information; and (4) interference with GME's rights and relations. As to its lien claim, GME alleged that it was entitled to compensation because without GME's services the shipwreck sites would not have been discovered and therefore GME's services significantly benefit any "full recovery of the historic shipwreck sites." In its count for unjust enrichment, GME asserted that it had conferred a substantial benefit to France based on its services related to the shipwreck sites. As to its misappropriation of trade secret claim, GME alleged that "[t]he precise locations of GME's discovered shipwreck sites and the methods used to identify those locations were proprietary and confidential information owned by GME" and that France's use of that information was unauthorized and without GME's consent. And, as to its interference claim, GME alleged that France knew of GME's contractual rights and advantageous business and contractual relations with FDOS but intentionally acted to influence, induce, and

collaborate with FDOS for the latter to abrogate its obligations to, and relations with, GME.

France moved to dismiss GME's amended complaint under Rule 12(b)(1), arguing that the district court lacked subject matter jurisdiction under the FSIA and that GME failed to show that the commercial activity exception to the FSIA applied. In particular, France contended that the core conduct at issue was its "intergovernmental cooperation for the historic preservation of [its] military vessel," which was manifestly a governmental function. France submitted a declaration from Florence Hermite, a "Magistrat de Liaison – Legal Attaché," who attested that France entered into the Declaration of Intent under the Heritage Code of France Section L522-1, which provides, as translated into English, that France "prescribes measures aimed at the detection, conservation of safeguarding by scientific study of the heritage archaeological, designates the scientific manager of any preventative archeology operation and carries out control and evaluation missions for these operations."

The district court granted France's motion to dismiss. The district court explained that the commercial activity exception had three components: whether "(1) the action is based upon (2) a commercial activity (3) carried on in the United States by a foreign state." The district court concluded that the action at issue was "France's intergovernmental declaration with Florida—and its overall relationship with Florida regarding the shipwreck sites," which "lack[ed] . . . a commercial nature" because France was not

involved in "the type of actions by which a private party engages in trade and traffic or commerce." While noting that private actors sometimes engage in marine exploration and shipwreck recovery and preservation efforts, the district court reasoned "that alone did not make France's activities commercial." The district court explained that "the nature of France's activity is the recovery and disposition of its own sovereign military property" and that its choice to recover or preserve the property was not like "entering a market and behaving as a private person would." The district court noted that the Declaration of Intent, signed by government actors, showed that France and FDOS were working together to protect and preserve *La Trinité* and that, as such, France had not entered the market or engaged in trade or commerce.

The district court also concluded that, even if France's activities were commercial in nature, GME's claims against France were not "based upon" those activities. The district court determined that "the foundation" for GME's alleged injuries was not France's intergovernmental declaration with Florida or activities related to that declaration, i.e., GME was not injured by the fact that France sought to preserve its culture or recover its shipwreck's artifacts. Rather, the district court reasoned GME's injuries were based upon the fact that France took ownership of *La Trinité*, which occurred in *GME I*, and that GME could not claim ownership of the *res*. The district court therefore concluded it lacked subject matter jurisdiction under the FSIA.

This timely appeal ensued.

## II.    STANDARD OF REVIEW

"When evaluating a district court's conclusions on a Rule 12(b)(1) motion, '[w]e review the district court's legal conclusions *de novo* and its factual findings for clear error.'" *Odyssey Marine Expl., Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1169 (11th Cir. 2011) (alteration in original) (quoting *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009)).  And we review *de novo* a district court's determination of whether it had jurisdiction under the FSIA.  *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1220 (11th Cir. 2018).

## III.    ANALYSIS

On appeal, GME argues that the district court erred in dismissing its amended complaint for two reasons.  First, GME asserts that the district court erroneously determined that the FSIA's commercial activity exception to foreign sovereign immunity did not apply to France's activities in the case.  Second, GME contends that its action against France was "based upon" France's commercial activities such that subject matter jurisdiction existed under the FSIA.  We address these arguments in turn.

### A.  Whether France's activities are "commercial activities" under the FSIA

The FSIA "supplies the ground rules for 'obtaining jurisdiction over a foreign state in the courts of this country.'"  *Federal Republic of Germany v. Philipp*, 141 S. Ct. 703, 709 (2021) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428,

443 (1989)).  The FSIA "creates a baseline of immunity from suit," *id.*; *accord* 28 U.S.C. § 1604, and "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state," *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

One such exception is the "commercial activity" exception contained in the first clause of 28 U.S.C. § 1605(a)(2).  The exception provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state."  § 1605(a)(2). Title 28 U.S.C. § 1603(d) defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act," and states that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."

While the definition in § 1603(d) "leaves the critical term 'commercial' largely undefined," the Supreme Court has explained that "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612, 614 (1992).  Additionally, because the FSIA "provides that the commercial character of an act is to be determined by reference to its 'nature' rather than its 'purpose,' the question is not whether the

foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives." *Id.* at 614 (quoting § 1603(d)).  Instead, we must determine "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* (quoting Black's Law Dictionary 270 (6th ed. 1990)).  Thus, whether a foreign state is acting in the manner of a private party "is a question of behavior, not motivation." *Nelson*, 507 U.S. at 360.  For example, a foreign state's "issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party" while "a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." *Weltover*, 504 U.S. at 614–15.

In *Weltover*, the Supreme Court concluded that Argentina's issuance of bonds as part of a plan to stabilize its currency was a commercial activity within the meaning of the FSIA. *Id.* at 620. The Court explained that the "commercial character" of the bonds was demonstrated by the fact that they were "in almost all respects garden-variety debt instruments," e.g., "[t]hey [could] be held by private parties, they [were] negotiable and [could] be traded on the international market[,] . . . and they promise[d] a future stream of cash income." *Id.* at 615.  And the Court rejected Argentina's argument that "the line between 'nature' and 'purpose' rests upon a 'formalistic distinction [that] simply is neither useful nor

warranted'" because that argument was "squarely foreclosed by the language of the FSIA." *Id.* at 617. It was thus "irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it matter[ed] only that it did so." *Id.*

Subsequently, in *Nelson*, the Supreme Court found that, unlike Argentina's activities in *Weltover*, the intentional conduct alleged by the plaintiffs—"wrongful arrest, imprisonment, and torture" by the Saudi Government—did not qualify as commercial activity because the conduct at issue "boil[ed] down to abuse of the power of its police by the Saudi Government" and "a foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature." 507 U.S. at 361. The Court explained that "[s]uch acts as legislation, or the expulsion of an alien, or a denial of justice, cannot be performed by an individual acting in his own name," and "can be performed only by the state acting as such." *Id.* at 362 (quoting Hersch Lauterpacht, *The Problem of Jurisdictional Immunities of Foreign States*, 28 Brit. Y.B. Int'l L. 220, 225 (1952)). Thus, the Court concluded that the "[e]xercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce." *Id.* And regardless of the Saudi Government's motivation for its allegedly abusive treatment of the plaintiff, e.g., to resolve commercial disputes, the Court explained that argument went to the activity's purpose, which was "irrelevant to the question of an activity's commercial character" under the FSIA. *Id.* at 362–63; *accord Honduras Aircraft Registry, Ltd. v.*

*Government of Honduras*, 129 F.3d 543, 548 (11th Cir. 1997) ("[I]n ascertaining whether the FSIA commercial exception applies, it is irrelevant that Honduras may have had a possible profit motive or that Honduras may have intended only to fulfill its unique sovereign objectives.").

We have since applied the principles of *Weltover* and *Nelson* several times in analyzing whether a foreign state's activities are commercial activities under the FSIA. For example, in *Honduras Aircraft*, Honduras had decided to "upgrade and modernize" its "civil aeronautics program to comply with international aviation laws." 129 F.3d at 545. In so doing, Honduras contracted with the plaintiffs to provide goods and services to help Honduras achieve this goal, including setting up a data base for Honduras's aircraft registry, writing regulations, training government personnel, and providing "the other things needed to register, inspect and certify aircraft." *Id.* at 547. Ultimately, Honduras breached the contract, and plaintiffs sued. Honduras moved to dismiss for lack of subject matter jurisdiction, arguing that the FSIA's commercial activity exception did not apply because "the inspection and registration of aircraft are powers peculiar to sovereigns, as private persons cannot grant airworthiness certificates and register aircraft." *Id.* We disagreed, explaining that while "registering aircraft under the Honduras flag is an act peculiar to its sovereignty," plaintiffs were not contending that the contract at issue "gave them the right to register aircraft." *Id.* at 548. Rather, the plaintiffs sought to enforce their contract with Honduras, in which "they contracted to provide

goods and services to Honduras in connection with its expanded civil air program by inspecting and certifying aircraft airworthiness so that Honduras would be able to appropriately register the aircraft under its flag." *Id.* Indeed, the contract provided "only that plaintiffs would provide the means and do the technical work," and we reasoned that "[a]ny party, sovereign or not, could contract for those goods and services." *Id.* Thus, we explained that Honduras commercially entered the market as a private player to secure technical assistance and upgrades for its civil air program. *Id.* at 548–49.

Similarly, in *Guevara v. Republic of Peru*, 468 F.3d 1289 (11th Cir. 2006), we addressed "whether a foreign state's offer of a reward in return for information enabling it to locate and capture a fugitive" fell within FSIA's commercial activity exception and we concluded that it did so. *Id.* at 1292. We noted that "[t]he location and capture of a fugitive by law enforcement officials of a country may be a sovereign act." *Id.* at 1298. But we explained that the reward offer at issue "did not promise that in return for the information it was seeking Peru would locate and capture" the fugitive, and the plaintiff was not seeking to compel the fugitive's capture. *Id.* at 1298–99. Instead, the plaintiff sought the monetary reward that Peru offered in exchange to anyone who furnished information "that enabled Peru to capture" the fugitive. *Id.* at 1299. We found the facts in *Guevara* similar enough to those in *Honduras Aircraft* to compel the same result—instead of using its sovereign powers to search for the fugitive, Peru ventured into the

marketplace to buy the information needed to locate the fugitive. *Id.* The plaintiff provided that information for a price—Peru's monetary reward offer. *Id.* Thus, we concluded that "[t]he underlying activity at issue—the exchange of money for information—[was] 'commercial in nature and of the type negotiable among private parties.'" *Id.* (quoting *Honduras Aircraft*, 129 F.3d at 547); *see also Devengoechea*, 889 F.3d at 1221, 1224 (explaining that the plaintiff's claims based on Venezuela's failure to pay the plaintiff for artifacts was commercial activity because, similar to a private purchaser, Venezuela met with the seller, examined the artifacts, and negotiated to examine them further and to possibly purchase them). We also rejected Peru's argument that "commercial activity" only included activities "done for a profit motive," as "a 'motive' test tread[ed] too closely to an examination of 'purpose.'" *Guevara,* 468 F.3d at 1302.

By contrast, in *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1326 (11th Cir. 2003), we concluded that the Pakistani government's alleged actions of expropriating Plaintiff's land involved the power of eminent domain—a sovereign power—and were therefore not commercial. We explained that "[c]onfiscation of real property is a public act because private actors are not allowed to engage in 'takings' in the manner that governments are" and that "[d]etermining whether or how to compensate property owners for takings is also a sovereign function, not a market transaction." *Id.* at 1326–27. Thus, even though the Pakistani government allegedly failed to provide the plaintiff with alternative property,

"the *nature* of the foreign government's act is public and not commercial." *Id.* at 1327.

And, in *Odyssey*, a shipwreck recovery business, Odyssey, discovered the remains of a Spanish vessel in international waters and filed an *in rem* admiralty action against the vessel and its cargo. 657 F.3d at 1166. *Odyssey* did not concern the FISA's commercial activity exception in § 1605(a) but rather 28 U.S.C. § 1609, the section of the FSIA that provides that a foreign state's property in the United States "shall be immune from attachment[,] arrest[,] and execution except as provided in [28 U.S.C. §§] 1610 and 1611." *See Odyssey*, 657 F.3d at 1175–76. Odyssey, however, did not invoke the exceptions provided in §§ 1610 or 1611; instead, it argued for "a commercial activity exception to § 1609's immunity to arrest." *Id.* at 1176. This Court rejected Odyssey's argument, as the international treaty that Odyssey asserted was incorporated into § 1609 did not "appear to create a commercial activity exception to § 1609's immunity to arrest." *Id.* We also noted that, even if such an exception existed, the Spanish vessel at issue was not engaged in commercial activity, as defined by § 1603(d), because it was not acting like an ordinary private person in the marketplace. *See id.* at 1176–77. We explained that at the time it sank the ship "was 'act[ing] . . . like a sovereign' by transporting [Spanish coins and cargo] during a time of threatened war" as part of the Spanish Navy. *See id.* at 1177 (some alterations in original) (quoting *Guevara*, 468 F.3d at 1298).

With these precedents in mind, we turn to the case before us. In its dismissal order, the district court determined that France's activities in the case consisted of "France's intergovernmental declaration with Florida—and its overall relationship with Florida regarding the shipwreck sites"—and that these activities were not commercial in nature. While recognizing that private actors engage in marine exploration activities and shipwreck recovery efforts, the district court reasoned that those activities alone did not make the nature of France's activities commercial, comparing the case to mail service, which can take both governmental and commercial forms. The district court construed "the nature of France's activity [as] the recovery and disposition of its own sovereign military property" and explained that, regardless of whether France chose to recover its property or work with Florida to preserve it, France was "not entering a market and behaving as a private person would." The district court also reasoned that it mattered "to some extent" that France's agreement was with Florida, not a private actor.

GME contends that the district court erred in finding that France's activities—a "marine archeological recovery project for recovery of six historical shipwreck sites in Florida"—did not constitute "commercial activity" under the FSIA. GME argues that the "what" of France's activity—effecting archaeological salvage recovery of historic shipwreck sites—and the "means" employed for the activity—e.g., negotiating agreements with Florida and others; directing, coordinating, and participating in recovery efforts;

securing private and grant source fundings; and conserving and arranging for the exhibition of artifacts—are commercial in nature. GME notes that similar types of activity are performed in commerce by private entities, including GME itself, "with which [FDOS] proposed to 'partner' for the same project." And GME asserts that the district court improperly looked to the "governmental direction or purpose" of France's activities, which is irrelevant to the question of an activity's commercial nature.

We agree with GME and conclude that the nature of France's activities here are commercial under the FSIA. As set forth by the Declaration of Intent, France, in cooperation with FDOS, planned to engage in a marine archaeological recovery project of the shipwreck sites off the coast of Cape Canaveral. And the Declaration of Intent provides that, to conduct this project, France will identify, evaluate, mobilize, and oversee "public and/or private resources and organizations." In other words, France, along with FDOS, planned to acquire funding and to hire organizations or businesses to conduct its shipwreck recovery efforts. And, according to GME's amended complaint, France has performed actions and entered into agreements with FDOS and others in connection with the shipwreck recovery project. These actions—fundraising, contracting with organizations and businesses to carry out excavations of shipwreck sites (i.e., asset recovery), and overseeing the logistics of the project—are "commercial in nature and of the type negotiable among private parties." *Guevara*, 468 F.3d at 1299 (quoting *Honduras Aircraft*, 129 F.3d at 547).

The district court focused on the fact that France had entered into the Declaration of Intent with another sovereign power (Florida) in order to recover and preserve the shipwreck sites, including *La Trinité*, and to promote the shared history of the United States and France in Florida.  But the district court's  analysis of France's activities was too narrow and "purpose" oriented.  "[T]he question is not whether the foreign government is acting with a profit motive or . . . with the aim of fulfilling uniquely sovereign objectives." *Guevara*, 468 F.3d at 1298 (quoting *Weltover*, 504 U.S. at 614).  "Rather the issue is whether the particular actions that the foreign state performs . . . are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* (quoting *Weltover*, 504 U.S. at 614).  Therefore, although the purpose of France's shipwreck recovery efforts may be to protect, recover, and preserve the shipwreck sites, and to promote its common history with the United States in Florida, "it is irrelevant *why* [France engaged in this shipwreck recovery project] in the manner of a private actor; it matters only that it did so." *Weltover*, 504 U.S. at 617.

France, however, argues that its activities are not commercial in nature because they are "required by the patrimony laws of France," as explained by the Hermite declaration it submitted in support of its motion to dismiss.  In support of its position, France relies on the Second Circuit's decision in *Barnet v. Ministry of Culture & Sports of the Hellenic Republic*, 961 F.3d 193 (2d Cir. 2020), which the district court also relied on in dismissing GME's amended complaint.  In *Barnet*, the Second Circuit faced the

question of whether Greece's assertion of ownership over an ancient Greek artifact constituted commercial activity under the FSIA. *Id.* at 195. An auction house announced it planned to auction the Greek artifact on behalf of a trust. When Greek officials learned of the auction, they emailed the auction house a demand letter, stating that the artifact belonged to Greece under its "patrimony laws" that declared Greek artifacts to be Greece's property. *Id.* The auction house withdrew the artifact from the auction, and both the trust and auction house filed suit against Greece, seeking declaratory relief on the disputed issue of ownership and asserting that the commercial activity exception—specifically, the third clause of § 1605(a)(2)—to the FSIA applied. *Id.*; *see* § 1605(a)(2) ("A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in which the action is based . . . upon an act outside of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.").

On appeal, the Second Circuit explained that Greece's predicate act—sending its demand letter to the auction house—was not taken "in connection with a commercial activity" by Greece outside of the United States. *Barnet*, 961 F.3d at 200 (quoting § 1605(a)(2)). The Second Circuit explained that "Greece undertook the act of sending the letter in connection with its claim of ownership over the figurine pursuant to its patrimony laws" and found that this act was sovereign in nature—Greece claimed ownership of the artifact "by adopting legislation that nationalizes

historical artifacts and by enforcing those patrimony laws." *Id.* at 200–01. The Second Circuit reasoned that "[n]ationalizing property is a distinctly sovereign act" and that Greece was "acting in a sovereign capacity by enforcing laws that regulate ownership and export of nationalized artifacts." *Id.* at 201. And the Second Circuit found that Greece's "insistence on recognition of and obedience to its patrimony laws [were] not 'the *type* of actions by which a private party engages in trade and traffic or commerce,'" nor "analogous to a private commercial transaction." *Id.* (quoting *Weltover*, 504 U.S. at 614, 616). Thus, the Second Circuit concluded that the adoption and pursuit of compliance with patrimony laws established that the nature of Greece's "activity was sovereign rather than commercial." *Id.* at 201–02.

But France's activities here are not like Greece's activity in *Barnet*. Therefore, we do not find *Barnet* persuasive here. To begin with, the activity at issue in *Barnet*—the sending of a letter claiming ownership of an artifact—is both narrower in scope and different in type than France's activities here, i.e., planning and executing a shipwreck recovery project with FDOS. More critically, we find that focusing on the foreign state's "patrimony laws" in this case would be akin to the "motive" test we warned of in *Guevara* that "treads too closely to an examination of 'purpose.'" 468 F.3d at 1302. While France's motive in pursuing the shipwreck recovery project may be to comply with its patrimony laws, "the Supreme Court has instructed us that the FSIA 'unmistakably commands' that we consider the nature, rather than the purpose of a

transaction." *Id.* at 1302. We must therefore look to the nature of underlying activity and determine whether it is commercial in nature, e.g., the type of activity that is "negotiable among private parties." *Id.* at 1299 (quoting *Honduras Aircraft*, 129 F.3d at 547); *see Devengoechea*, 889 F.3d at 1221 ("[W]hether a foreign government acts out of a profit motive or out of a desire to fulfill 'uniquely sovereign objectives' is entirely irrelevant to the analysis of whether an activity qualifies as 'commercial.'" (quoting *Weltover*, 504 U.S. at 614)). And as we have already discussed, fundraising, entering into contracts with third parties to engage in marine excavation and asset recovery, and overseeing the logistics of that project are commercial in nature, as they are the type of activities that private parties (including GME) engage in.

France further relies on *Odyssey*, but that case is also distinguishable from the case before us. As explained above, in *Odyssey*, we faced an *in rem* action to determine ownership of a shipwreck and the application of § 1609, not § 1605, of the FSIA. Odyssey asked us to create a commercial activities exception to § 1609's immunity to arrest, arguing that the Spanish ship was engaged in commercial activity when it sank. In rejecting this argument, we concluded that there was not "a commercial activity exception to § 1609's immunity to arrest." *Odyssey*, 657 F.3d at 1176. We also noted that, even if such an exception existed, Spain's activities in operating the ship, during the late 18th and early 19th centuries, were sovereign in nature. *Id.* at 1176–77. Unlike *Odyssey*, GME's claims concern France's current-day activities in pursuing recovery

efforts with FDOS of the shipwreck sites—the same activities GME was pursuing with FDOS—not the military activities that France was pursuing when *La Trinité* and other ships of the Royal Navy of France sank in 1565. Thus, while *Odyssey* may have some relevance to *GME I*—the earlier *in rem* proceeding—it does not apply to this case where GME seeks damages based on the nature of France's present-day activities.

We therefore conclude that France's activities here are commercial activities under the FSIA.

## B.  Whether GME's action is "based upon" France's commercial activities

Although we conclude that France's activities are commercial under the FSIA, our inquiry under § 1605's commercial activity exception does not end there. Under § 1605(a)(2), we must also determine whether GME's action is "based upon" France's commercial activities. *See Nelson*, 507 U.S. at 356. To do so, "we must identify the conduct upon which the suit is based" by looking at "the 'particular conduct' that constitutes the 'gravamen' of the suit," i.e., "the 'core' of the suit." *Devengoechea*, 889 F.3d at 1222 (quoting *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015)); *see also Nelson*, 507 U.S. at 358 (explaining that the only reasonable reading of the term "based upon" is that it "calls for something more than a mere connection with, or relation to, commercial activity."). But we do not undertake an "exhaustive claim-by-claim, element-by-element analysis" of the plaintiff's cause of action. *Sachs*, 577 U.S. at 34.

For example, in *Devengoechea*, the plaintiff filed suit against Venezuela for failing to pay for or return to him artifacts belonging to Simón Bolívar.  889 F.3d at 1217.  In determining whether the plaintiff's action was "based upon" Venezuela's commercial activity, we explained that the conduct that injured the plaintiff—and made up the gravamen of his suit—was Venezuela's failure to pay for or return the artifacts.  *Id.* at 1223.

Here, the district court assumed, for the sake of this part of its analysis, that France's activities were commercial in nature and found that GME's injury was not "based on" the Declaration of Intent and that France's activities were not related to the Declaration, i.e., the shipwreck recovery project.  Rather, the district court found that GME's action was "based upon the fact that France took ownership of the ship," which "occurred the moment the [*GME I* district court] concluded that the *res* was *La Trinité* and belonged to France."  GME contends that this characterization of its suit against France was in error.  Rather, GME argues, the gravamen of its suit is France's activities related to the shipwreck recovery project and France's failure to compensate GME for a substantial benefit it conferred to France—the value of its services that led to the discovery of the shipwreck sites including *La Trinité*.  And GME argues that, without its services, France could not have undertaken the shipwreck recovery project.

While we pass no judgment on the merits of GME's claims, we find that the "gravamen" of GME's suit is France's activities in executing the shipwreck recovery project and its failure to

compensate GME for the value of the services. Indeed, the core of GME's claims against France—claims for an *in personam* salvage lien award, unjust enrichment, misappropriation of trade secret information, and interference with its rights and relations—is France's failure to compensate GME for the value of GME's salvaging services. *See Devengoechea*, 889 F.3d at 1223 ("The conduct that actually injured Devengoechea—and therefore that makes up the gravamen of Devengoechea's lawsuit—is Venezuela's failure to return the Bolívar Collection to Devengoechea or to pay him for it."). GME's salvage services led to the discovery of *La Trinité* and the other shipwreck sites, which, in turn, led to France's joint shipwreck recovery project with FDOS, as set forth by the Declaration of Intent. And, as explained above, France's activities in planning and executing the shipwreck recovery project qualify as "commercial activity."

We therefore hold that the FSIA's commercial activity exception to foreign sovereign immunity applies because GME's action is "based upon" France's commercial activity in the United States. Accordingly, the district court had subject matter jurisdiction over GME's suit against France.

## IV.    CONCLUSION

For these reasons, we reverse the district court's order dismissing GME's amended complaint for lack of subject matter jurisdiction and remand for further proceedings.

**REVERSED and REMANDED.**