[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-10148

_____

GLOBAL MARINE EXPLORATION, INC.,

Plaintiff-Appellant,

*versus*

REPUBLIC OF FRANCE,

Defendant-Appellee,

UNITED STATES OF AMERICA

Intervenor.

_____

2                 Opinion of the Court                 24-10148

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:20-cv-00181-AW-MJF

_____

Before WILLIAM PRYOR, Chief Judge, and LUCK and BRASHER, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether the Sunken Military Craft Act bars a salvage claim brought by Global Marine Exploration, Inc., against the Republic of France. In 1565, *la Trinité*—a French ship sent to resupply and defend a struggling French fort in Florida—sunk off the coast of Cape Canaveral during a hurricane. In 2016, Global Marine—an underwater exploration company—discovered the remains of *la Trinité* on the ocean floor. After France claimed the ship and obtained a dismissal without prejudice of an *in rem* action filed by Global Marine, Global Marine brought an *in personam* action against France for the salvage value of its work. It also sued for unjust enrichment, misappropriation of trade secrets, and tortious interference. The district court granted summary judgment for France. We affirm.

## I. BACKGROUND

We describe the background of this appeal in four parts. We first review the record developed by the parties to describe the last voyage of *la Trinité* and the hurricane that sank it. We next describe the events that led to *la Trinité*'s discovery. We then describe the *in*

*rem* action Global Marine brought against the ship. And we last recount the *in personam* action Global Marine brought against France.

### A.  *In 1565,* la Trinité *Sinks Off the Coast of Florida.*

Two 16th-century storylines set the stage for the sinking of *la Trinité* and France's doomed efforts to colonize Florida. The first is one of empire: France, England, Spain, Portugal, and the Netherlands all hungered for new lands, new trade routes, and new resources in the so-called New World. The second is one of religion: Europe, long united in faith under the Catholic Church, fractured and descended into religious wars as the Protestant Reformation spread from kingdom to kingdom.

In 1562, France sat at the center of both storylines. For decades, the kingdom had disputed Spain's claim to all newly discovered lands in the Americas. And for decades, fleets of French ships had stalked Atlantic waters, raided Spanish colonies, and attacked Spanish ships. These fleets, carrying French mariners called corsairs, often were controlled by French nobles and merchants. And often the French monarch granted the ships' captains letters of marque, which allowed the corsairs to engage in privateering that would otherwise be called piracy.

The French corsairs' raiding and trading in the Americas ignited diplomatic flare-ups with Spain and eventually a war. The two kingdoms reached an uneasy truce in 1559, when they signed the Treaty of Cateau-Cambrésis. Although this treaty generally permitted merchants from France to conduct business in Spain's

colonial territories, negotiations stalled over France's rights, if any, to lands in the New World.

As France addressed its geopolitical crisis abroad, it also faced a religious crisis at home. By the 1550s, the Protestant Reformation had attracted converts, eventually known as Huguenots, within the kingdom's borders. This religious schism threatened French national identity, destabilized the kingdom, and led to outbreaks of religious violence. But by 1561, despite religious persecution, approximately 10 percent of the French population had converted to Protestantism.

This geopolitical and domestic unrest set the stage for France's three ill-fated attempts to establish a colony in Florida. The efforts were led by Gaspard de Coligny, Lord of Châtillon and Grand Admiral of France. King Henri II appointed Coligny Admiral of France in 1552. Coligny retained his position as Admiral even after he became a Huguenot. In this role, Coligny oversaw defense of the French coastline. He directed French missions to the Americas. He negotiated with Spain. And he used his position to advocate for religious tolerance.

In 1562, Coligny appointed Jean Ribault, another Huguenot, to lead the first French naval expedition to Florida. Ribault was more than qualified to take command. A storied seafarer, he had commanded French vessels in battles against the Spanish, English, and Flemish for years.

Under Ribault's command, two ships sailed from France on February 18, 1562, and made landfall in Florida two months later.

Once ashore, the ships' crews erected a "piller or colume of hard stone, our kinges armes graven therin," near the mouth of the River May (known today as the St. Johns River). From there, the ships sailed north until they reached Parris Island, off the coast of present-day Georgia. Ribault ordered part of the crew to disembark, stay behind, and build a settlement, named Charlesfort. Ribault departed Charlesfort in June 1562 after promising to return the next year with supplies and reinforcements.

Ribault returned to a France at war with itself. In March 1562, only a month after he set sail for Florida, a massacre of Huguenots sparked the beginning of the first War of Religion. Ribault joined a Huguenot rebellion against the crown. When that rebellion failed, and its leadership surrendered to royalist forces, Ribault fled to England, where he was imprisoned in the Tower of London as a suspected spy. Meanwhile, the settlers of Charlesfort, starved without reinforcements, abandoned the French outpost and set sail for Europe.

With Ribault confined in the Tower of London, Coligny needed a new leader for his second mission to Florida. He recommended René Goulaine de Laudonnière, a Huguenot and Ribault's second-in-command during the 1562 mission, to King Charles IX. After King Charles IX approved the commission and furnished ships and supplies for the voyage, Laudonnière set sail for the New World on April 22, 1564, taking with him soldiers, sailors, and Huguenot settlers. The fleet landed at the St. Johns River on June 22,

1564, and established a new settlement, called Fort Caroline, up-river.

The third and final French foray to Florida took place in 1565. Ribault, released from English custody, resumed service in the French naval forces. And Admiral Coligny again commissioned Ribault to command a fleet headed to Florida—this time, to resupply and reinforce Fort Caroline. As with the 1564 expedition, King Charles IX approved of and supported the mission. He summoned Ribault to "the court" and "honor[ed] him with the title of . . . lieutenant and leader of the troops which he had been commanded to raise." Mindful of the fragile peace with Spain, King Charles IX also "forbade [Ribault] from making a landfall in any other country or island, especially those which were under the dominion of the King of Spain."

By then, Spain had caught wind of France's encroachment in Florida. In 1564, King Philip II ordered his forces in Havana to investigate and eradicate any French presence. But when the first Spanish expedition stumbled upon Charlesfort, the French settlers were gone.

King Philip II's second attempt to wrest Florida away from the French took on greater urgency when he learned about Fort Caroline and Ribault's upcoming 1565 expedition. On March 20, 1565, he gave Pedro Menéndez de Avilés—an experienced Captain General who had long commanded ships in Spain's treasure fleets—a royal appointment to settle and govern Florida. Days later, Spain learned of France's second settlement, Fort Caroline.

A Spanish spy at the French port of Dieppe sent news of Ribault's new fleet. The spy's report described "[seven] ships," "very well armed with artillery, people and munitions," including "[f]ive hundred soldiers." And he added that "the King of France released from his Rouen profits 100 thousand francs for this enterprise." In the light of this fresh intelligence, Spain bolstered Menéndez's forces, expanding the fleet to over 10 ships and 995 soldiers and sailors.

While Menéndez outfitted his armada, the French ambassador in Spain sent back news of Spain's planned attack on Fort Caroline. This intelligence changed the nature of Ribault's voyage from relief mission to military venture. As of April 1565, Ribault had focused his efforts on recruiting more Huguenot settlers and garnering supplies. But after word of Menéndez's armada reached the French on April 3, Ribault and Coligny expanded the scope of the expedition. Seven ships, instead of the planned five, prepared to go to Florida. Each ship was a heavily armed "galleass[]," and four weighed over 100 tons. At least 500 soldiers joined the civilian settlers, with the final headcount for the expedition numbering between 700 and 1000.

French Registers of Artillery for May 1565 confirm that the "treasurer and guard of artillery and munitions of the Navy in Normandy" issued arms and equipment to "Ribault[,] ordinary captain of the Navy [and] chief and conductor of the ships and people of war that the King sends presently to the country of New France." Elsewhere, the armament records referred to *la Trinité* and another

ship, *l'Émérillon*, as "belonging to the King." Both were armed with "artillery, both of bronze and wrought iron, powder, cannonballs, [and] artifices of war."

With both the Spanish and French fleets stocked and armed, the race to Florida began. On May 22, 1565, Ribault set sail on *la Trinité*, the flagship leading the seven French ships. Over a month later, on June 29, 1565, Menéndez followed Ribault to Florida on *San Pelayo*, one of Spain's largest warships.

Both fleets reached Florida on the same day. On August 28, 1565, Ribault's fleet made landfall south of Fort Caroline, and Menéndez grounded his armada near present-day Cape Canaveral. Ribault sent the three smaller ships upriver to Fort Caroline while the four larger ships—too large to sail over the sandbar—anchored offshore of the mouth of the St. Johns River. In the meantime, Menéndez sailed north in search of Ribault's fleet.

On September 4, 1565, the Spanish fleet spotted the four anchored French ships. Menéndez drew close to the ships under the cover of night, with plans to attack in the morning. But before dawn came, the fleets' crews traded escalating threats. Menéndez warned that he "had come to this coast to burn and hang the French Lutherans whom [he] should find . . . in the morning [when he] should board their vessels." The Frenchmen urged him to "come on and not wait till morning." But before Menéndez could order an attack, Ribault's ships "cut their cables, and hoisted their sails, and all four of them took to flight." Menéndez gave chase but could not make ground on Ribault's ships.

Outpaced, Menéndez retreated and sailed south. He made landfall at a natural harbor, which he named St. Augustine and claimed in the name of King Philip II. From there, Menéndez began disembarking soldiers and armaments in preparation for a land invasion of Fort Caroline.

One of Ribault's ships tailed Menéndez to the newly christened St. Augustine. Reports that the Spanish fleet had anchored and set up base reached Ribault soon after. He decided to attack, and on September 8, 1565, his largest ships, reinforced with soldiers from Fort Caroline, sailed south.

Ribault descended on the Spanish fleet on September 10, 1565. But Menéndez's ships, protected by landed cannons, took shelter in the harbor before Ribault could overtake them. While Ribault's fleet lay in wait, a "hurricane and terrible storm came upon them." The French ships, caught in the hurricane, were driven south and sank off the coast of Cape Canaveral.

A few days later Menéndez—now sure that Ribault's fleet posed no further threat—marched Spanish troops northward. In quick succession, his forces stormed the depleted Fort Caroline, captured it, and then used the Fort's own cannons to sink one of the small French ships that remained. Captain Laudonnière, who had remained behind to defend Fort Caroline, fled on the two remaining ships and sailed back to Europe.

As for Ribault, he did not go down with *la Trinité*. Instead, he swam ashore, along with many of the soldiers who sailed to attack the Spanish fleet. It took Menéndez only about a month to

track down the French survivors. He beheaded almost all of them, including Ribault.

B.  *In 2016, Global Marine Discovers the Remains of* la Trinité.

*La Trinité* rested undisturbed in its watery grave for more than four centuries. Then, in 2015, Global Marine applied for and received an exploration permit from the Florida Department of State, Division of Historical Resources. The permit gave Global Marine permission to explore a three-square-mile area offshore of Cape Canaveral. Under the permit's terms, Global Marine could "delineate the extent of historic shipwreck site(s)" and "[e]valuate the potential characteristics and significance of any historic ship-wreck site in consultation with the Division."

The permit conditioned Global Marine's exploration activities on the submission of daily field notes and logs, interim reports, and final reports. Detailed regulations, promulgated by the Division of Historical Resources, provided the specifics of those reporting requirements. For example, one regulation required Global Marine to submit "Survey Log Sheets" with "topographic quadrangle map[s]," "site locations," and photos to the Division. FLA. ADMIN. CODE ANN. r. 1A-46.001 (2025). Another permit condition required Global Marine to "immediately contact" the Division upon the discovery of "a historic or prehistoric archaeological site" so that the Division could help "coordinat[e] submission of new or revised Florida Master Site File site forms."

After more than a year of searching, Global Marine identified five shipwrecks at six sites off the coast of Cape Canaveral.

Eager to cash in on the find, Global Marine's CEO and president, Robert Pritchett, first contacted France about the discoveries. In a May 30, 2016, email to the French Embassy in Washington, D.C., Pritchett stated, "I am working with the State of Florida in the Area of Cape Canaveral and we may have found French shipwreck related items from the 16-17th century." He also included a list of questions about "the Trinity," its cannons, anchors, coat of arms, and Ribault's fleet. And he offered to enter "an agreement" with France to "bring up" the discovered "items/artifacts."

Under the permit's requirements, Pritchett next submitted a "Notification of Find Report" to the Division on June 3, 2016. The report described the discovery of a cannon (marked with the French *fleur de lis*) and a stone monument (likely the one Ribault erected near St. Johns Bluff during his first voyage to the new world) at what it called Site #2. Weeks later, on June 30, 2016, Global Marine sent the Division its "Final Dig & Identify Report and Request for Rescue Recovery Permit." The report contained additional photos of bronze cannons on the ocean floor and the marble monument. The report also acknowledged "strong indications" that the artifacts belonged to *la Trinité*, and that "France, Spain, England and other countries must be contacted."

Instead of responding to Pritchett's outreach, France issued a diplomatic note to the United States Department of State about *la Trinité* in July 2016. The note made clear that France would not enter a relationship with Global Marine. France stressed that "as part of a royal fleet of Charles IX, the sunken ship and all its

contents are under the ownership of the French Republic." This position, the note explained, was consistent with France's formal notice, published in the Federal Register, that "every State craft (e.g. warship, naval auxiliary and other vessel . . . owned or operated by a state) enjoys sovereign immunities, regardless of its location and the period elapsed since it was reduced to wreckage." France categorically "oppose[d] any commercial exploration on the vessel discovered by Global [Marine]."

Pritchett followed up with the Division about his Final Report in mid-July 2016. A Division employee responded that Pritchett's final report was incomplete. Missing from its pages was "[l]ocation information," including the "coordinates of the archeological material," "[b]oundaries for potential sites, and coordinates of site components." Not only were these details "critical" for the Division's "potential assessment of the site," but they were "also necessary to advance the discussion with the appropriate French authorities." Pritchett explained that Global Marine did not include "specific coordinates in the reports due to the fact it would become public information." But in the end, he acquiesced and promised to send "the GPS coordinates." The Division employee, in turn, explained that the Division had "an exemption under Florida's public records law and [was] not required to divulge site location information as part of public records requests."

Pritchett followed up with France on July 21, 2016. He asked whether France's diplomatic note represented the "position of France on [the] issue." He also emphasized that he "never said" that

the shipwreck "was [F]rench"; instead he had asked to "make a[n] arrang[e]ment in the State of Florida" or otherwise "IF it turn[ed] out to be a Military French ship." An attaché at the French embassy in Washington, D.C., replied that France would permit "no commercial exploitation whatsoever." Pritchett responded that he "respect[ed] France's wish[es]."

### C. *Global Marine Brings an* In Rem *Salvage Claim Against* la Trinité.

Despite Pritchett's assurance, Global Marine filed suit *in rem* against the sunken ship in the Middle District of Florida in October 2016. *See Glob. Marine Expl., Inc. v. The Unidentified, Wrecked & (for Finders-Right Purposes) Abandoned Sailing Vessel* (*Global Marine I*), 348 F. Supp. 3d 1221, 1223 (M.D. Fla. 2018). It now disputed whether the ship was, in fact, *la Trinité*. *Id.* at 1223–24, 1228. Global Marine brought a claim under the law of finds and sought a salvage award. *Id.* at 1224. It also asked for declaratory judgment that "no government ha[d] the authority to interfere with" its "exploration and recovery" of the vessel and for a preliminary injunction that prohibited "rival salvors" from accessing the site. *Id.*

The Middle District issued a warrant of arrest *in rem* for the vessel. *Id.* To execute the warrant, United States Marshals seized several artifacts—including "3 cannon balls, 3 ballast stones, [and] one pick head"—that Global Marine had recovered from the site of *la Trinité*. *Id.* The Marshals then surrendered those artifacts back to Global Marine, which the Middle District appointed as custodian of the vessel. *Id.*

France then appeared in the suit, contested Global Marine's claim, and moved to dismiss for lack of jurisdiction. *Id.* The *res* in question, France asserted, was a ship from "the French Royal Fleet of 1565 commanded by Jean Ribault and sunk by a hurricane in the vicinity of what is now Cape Canaveral, Florida." *Id.* And the Middle District, France argued, lacked "subject matter jurisdiction because the *res* [was] the French Royal Vessel *la Trinité* and ha[d] immunity" from Global Marine's claims. *Id.* at 1225.

In the meantime, Florida learned about Global Marine's removal of artifacts from *la Trinité*. It determined that the artifacts "were illegally recovered in violation of" Global Marine's permit and Florida regulations. Not only had Global Marine used "methods beyond the scope of the permit" to recover artifacts not "authorized for recovery by the permit," but it had also failed to notify the "Project Archaeologist prior to recovery."

Florida responded to Global Marine's artifact recovery with legal and administrative action. On the legal side, the Middle District granted Florida's request to take over as custodian of the ship in the *in rem* action. *Id.* at 1224–25. On the administrative side, Florida "suspend[ed]" Global Marine's exploration permit. Then, after Global Marine failed to "return the artifacts," Florida notified Global Marine that it "intend[ed] to revoke" its permit. Later, Florida denied Global Marine's "application for recovery of materials in the permit area" because the company failed to comply with the terms of its previous permit.

The Middle District—after much jurisdictional discovery—granted France's motion to dismiss. *Id.* at 1226. It explained that "[a]lthough federal courts have the exclusive power to adjudicate *in rem* suits against a vessel, that power is dependent on the court's jurisdiction over the *res*." *Id.* at 1227. "If the *res* at issue is the property of a foreign state," the court continued, "the federal courts only have jurisdiction to arrest the *res* if authorized by the Foreign Sovereign Immunities Act." *Id.* (alteration adopted) (citation and internal quotation marks omitted). Under that Act, France and its property "[were] presumptively immune from the jurisdiction of the United States courts; unless a specified statutory exception applie[d]." *Id.* (alteration adopted) (citation and internal quotation marks omitted). Global Marine did "not assert that any exception to the [Act] appl[ied]." *Id.* at 1228. So the "lone issue to be decided . . . [was] a question of fact: Is the *res la Trinité*?" *Id.*

After an exhaustive historical and geographic survey, the Middle District ruled that France "establish[ed] by a preponderance of the evidence that the *res* is *la Trinité*." *Id.* at 1242. It explained that Global Marine "ha[d] not come forward with sufficient evidence to undermine [that] conclusion." *Id.* Instead, Global Marine relied on "speculation" that "[m]aybe some unnamed non-French ship somehow gained control of cannons like those on *la Trinité* and a territorial monument like that on *la Trinité* and then happened to sink in the exact place that *la Trinité* is known to have sunk—all without leaving any documentary evidence." *Id.* Those

arguments, the Middle District concluded, were "not persuasive." *Id*. Global Marine did not appeal this ruling.

With the identity of the vessel settled, France and Florida announced a joint venture to protect and recover *la Trinité*. This venture included the "recovery of the shipwreck" *la Trinité* and "the other shipwrecks" from Ribault's fleet.

### D.  *Global Marine Brings an* In Personam *Suit Against France.*

Global Marine then filed this *in personam* action in the district court against France in April 2020. This suit no longer asserted any claims to the ship itself. Instead, Global Marine sued France for damages related to its efforts and the benefits those efforts conferred on France.

The operative complaint alleged four claims. First, it sought a "salvage and/or maritime lien" award "under federal admiralty law" to compensate Global Marine for "services in the discovery, location, identification, or mapping of the shipwreck sites being recovered by France." Second, it alleged a "quasi contract/unjust enrichment" claim to recover the value of "services benefitting France." Third, it alleged a claim for "misappropriation of trade secret information"—the secrets being "coordinate location data" for the shipwrecks. And fourth, it alleged tortious interference with Global Marine's relationship with the Florida Department of State.

France again moved to dismiss. It asserted that the district court lacked subject-matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604, and that the commercial-

activity exception was inapplicable to its recovery of *la Trinité*. The district court agreed with France and dismissed the action.

We reversed. *Glob. Marine Expl., Inc. v. Republic of France*, 33 F.4th 1312, 1315 (11th Cir. 2022). We held that the commercial-activity exception to sovereign immunity applied. *Id.* The "gravamen" or "core" of Global Marine's claims against France, we explained, was "France's failure to compensate" Global Marine for "the value of [its] salvaging services." *Id.* at 1324–25.

On remand, France moved for summary judgment. It argued that the Sunken Military Craft Act barred the complaint for a salvage award. *See* Pub. L. No. 108-375, §§ 1401–08, 118 Stat. 1811, 2094–98 (2004) (codified at 10 U.S.C. § 113 note). That Act provides that "[n]o salvage rights or awards shall be granted with respect to . . . any foreign sunken military craft located in United States waters without the express permission of the relevant foreign state." *Id.* § 1406(d)(2). And it defines "sunken military craft" to mean "all or any portion of . . . any sunken warship, naval auxiliary, or other vessel that was owned or operated by a government on military noncommercial service when it sank." *Id.* § 1408(3)(A). France contended that the categorical bar on salvage awards applied to Global Marine's *in personam* claim.

Global Marine's response on salvage was twofold. First, it argued that the Sunken Military Craft Act barred only *in rem* salvage claims, not *in personam* salvage claims. Second, it asserted that *la Trinité* was not a "sunken military craft" under the Act because it was not "on military noncommercial service when it sank."

In support of its arguments, Global Marine cited the reports of two experts: Dr. Lubos Kordac and Dr. Robert H. Baer. Dr. Kordac, in his one-page report, argued that *la Trinité* "was not any military ship." Instead, *la Trinité* "was a cargo ship, bringing supplies, civilians and money to the new French colony." He cited no sources to back up his assertion. Dr. Baer, who also submitted a one-page statement, also argued that the "assertion that the Huguenot supply vessel, the 'Triniti' was a military vessel on a military mission is erroneous." Instead, "the 'Triniti' was a civilian (Huguenot) resupply vessel dispatched to the Fort Caroline Huguenot outpost." Baer, unlike Kordac, included two pages that listed and briefly excerpted a few sources.

France replied to Global Marine with its own experts. The report of Dr. Frank Lestringant described Ribault's expeditions to Florida from the French perspective. His report explained the geopolitical and religious context that led to the voyages. It also detailed the military nature of the 1565 mission, describing Ribault's fleets as composed of "warships." Lestringant backed up his report with citations to nearly 250 pages of primary and secondary sources. The report of Dr. James P. Delgado did the same but from the Spanish perspective. He described the military confrontation between Spain and France in a long report supported by hundreds of pages of source material.

Global Marine, perhaps recognizing the gap between its two experts and those proffered by France, asked to submit two more expert reports and a surreply. Its first additional expert,

Emmanuelle Lize, submitted an eight-page report intended "to refute the Lestringant Declaration." To that end, she asserted that France and Spain were at peace in 1565, so the "mission of Ribault's fleet cannot be military because it would have been a violation of the Treaty [of Cateau-Cambrésis]." She asserted that "Coligny was not following the King's orders when he sailed *La Trinité* and had his own private agenda to establish a Protestant settlement." She also argued that Coligny had "close ties with privateers" and was the "main organiser of the privateering war" against Spain. Finally, she concluded that "Ribault's 1565 fleet was permitted by the King of France to transport Protestant dissenters to Fort Caroline and any activities of war or battle were beyond the scope of authority and were not official state actions." The body of her report contained no citations to primary or secondary sources. Instead, Lize attached 200 pages of documents, almost entirely in untranslated French.

Global Marine's final expert, James J. Sinclair, also responded to Dr. Lestringant's declaration and disputed its conclusions. Sinclair reviewed "the same source materials" cited by Dr. Lestringant but argued that "*La Trinité* was [on] a state-sanctioned voyage [that] permitted only the transport of families, farmers, and food to Fort Caroline." "*La Trinité* was not," he asserted, "on military noncommercial service when it sank—it sank in a hurricane, not because of a military attack or engagement." He also stated that "any military activity exceeded and countermanded the crown's directive to maintain peace and required [the] fleet [to] steer clear of Spain."

The district court granted summary judgment for France. It ruled that the bar on salvage awards, under the Sunken Military Craft Act, covered both *in rem* and *in personam* actions. It also ruled that France met its "initial summary-judgment burden" to establish that *la Trinité* was a "sunken military craft." Global Marine, it concluded, "point[ed] to no evidence contradicting the contention that *la Trinité* sank while on a mission to attack the Spanish fleet." So Global Marine failed to create a genuine dispute of fact about whether the ship was on "military noncommercial . . . service when it sank." *See* § 1408(3)(A), 118 Stat. at 2098. For the "quasi contract/unjust enrichment claim," the district court ruled that Global Marine "pointed to no evidence that France knowingly accepted any benefit" from Global Marine. For the "misappropriation of trade secrets claim," it ruled that Global Marine "fail[ed] to show that the GPS coordinate information qualifie[d] as a trade secret because there is no evidence that [Global Marine] took reasonable efforts to protect the information." And for the "interference" claim, it ruled that the "privilege of interference" protected France's actions.

## II. STANDARD OF REVIEW

We review a summary judgment *de novo*. *Bearden v. E.I. du Pont de Nemours & Co.*, 945 F.3d 1333, 1337 (11th Cir. 2019). We draw all reasonable inferences in favor of Global Marine and view the evidence in the light most favorable to it. *CSX Corp. v. United States*, 18 F.4th 672, 678 (11th Cir. 2021).

### III. DISCUSSION

We divide our discussion into two parts. First, we address Global Marine's salvage claim, and we reject the argument that the bar on salvage awards, under the Sunken Military Craft Act, extends only to *in rem* actions. And we explain that the bar applies to this suit because the undisputed record establishes that *la Trinité* was on military noncommercial service when it sank. Second, we explain that the record presents no genuine issues of fact about the claims for unjust enrichment, trade-secret misappropriation, and tortious interference.

*A. The Sunken Military Craft Act Bars Global Marine's*
In Personam *Salvage Claim.*

In 2004, Congress enacted the Sunken Military Craft Act. §§ 1401–08, 118 Stat. at 2094–98. The Act prohibits "any activity directed at a sunken military craft that disturbs, removes, or injures [it]" unless the activity is authorized by a permit or some other law. *Id.* § 1402. It also forecloses traditional maritime-law claims of salvage for sunken military craft. *Id.* § 1406(d) ("No salvage rights or awards shall be granted with respect to . . . any United States sunken military craft" or "any foreign sunken military craft located in United States waters without the express permission of the relevant . . . state."). And it defines "sunken military craft" as "any sunken warship, naval auxiliary, or other vessel that was owned or operated by a government on military noncommercial service when it sank." *Id.* § 1408(3)(A).

Global Marine contends that the Sunken Military Craft Act allows its *in personam* salvage claim against France for two reasons. First, it argues that the Act "preserves salvors' *in personam* claims because such claims are 'not directed at a sunken military craft,' but at the owner of the craft itself." Second, it argues that "*La Trinité* is not a 'sunken military craft'" under the Act. We reject both arguments.

### 1. The Sunken Military Craft Act Bars Salvage Awards for Both *In Rem* and *In Personam* Actions.

Global Marine argues that the Act's bar on salvage claims does not apply to *in personam* actions. We disagree. The plain language of the Act, considered in the context of traditional principles of admiralty, belies Global Marine's interpretation.

Traditionally, a salvor invoking admiralty jurisdiction could bring an *in rem* or an *in personam* action to recover a salvage award. *See* 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 16.1 (6th ed. 2024) ("Under settled principles of admiralty jurisdiction, the federal district courts have subject matter jurisdiction in cases involving marine salvage. The salvage act gives rise to a right to a reward, and a maritime lien is created in the salved property. Accordingly, the courts may exercise jurisdiction both *in personam* and *in rem* under appropriate circumstances." (footnotes omitted)). The Supreme Court recognized this principle as early as 1880, when it explained that "[s]uits for salvage may be *in rem* against the property saved or the proceeds thereof, or *in personam* against the party at whose request and for whose benefit the salvage service

was performed." *The Sabine*, 101 U.S. 384, 386 (1880). Venerable admiralty treatises echo that although "[g]enerally, a suit for a salvage award is one brought *in rem*," "[t]he salvor also has his remedy *in personam* against the owners of the salved property." *E.g.*, 3A BENEDICT ON ADMIRALTY § 288 (2025). And our predecessor circuit likewise affirmed that a federal court exercising its admiralty jurisdiction could grant salvage rights or awards *in rem* or *in personam*. *Treasure Salvors, Inc. v. The Unidentified Wrecked & Abandoned Sailing Vessel*, 640 F.2d 560, 567 (5th Cir. Mar. 1981).

The Sunken Military Craft Act states that "[*n*]*o* salvage rights or awards shall be granted with respect to . . . any foreign sunken military craft located in United States waters without the express permission of the relevant foreign state." § 1406(d), 118 Stat. at 2097 (emphasis added). This plain language makes no distinction between *in rem* and *in personam* suits. And its failure to do so makes sense in the light of settled principles of admiralty regarding the movement of vessels in maritime commerce. *See* 1 SCHOENBAUM, *supra*, § 9:1 (discussing the relationship between *in rem* and *in personam* actions based on maritime liens).

Global Marine's counterargument invokes the structure of the Act. It points to section 1402, which generally prohibits "activity directed at a sunken military craft that disturbs, removes, or injures [it]." 118 Stat. at 2094. And it points to section 1406(a), which makes clear that nothing in the Act "is intended to affect" either "any activity that is not directed at a sunken military craft" or "the traditional high seas freedoms of navigation" like "the laying of

submarine cables" or "fishing." 118 Stat. at 2096. Global Marine argues that we must read the ban on salvage awards in section 1406(d) in the light of sections 1402 and 1406(a), which focus on activities "directed at" sunken vessels. *In personam* claims, it posits, are not "directed at" sunken military craft. So section 1406(d)'s prohibition of salvage claims, it reasons, does not reach *in personam* claims.

We reject this strained interpretation. Section 1402(a) bans activities that could physically disturb a sunken military craft. Penalties in sections 1404 and 1405 provide enforcement mechanisms for that ban. Section 1406(a) clarifies that the prohibition of section 1402 and the associated penalties do not apply if the relevant physical activity was "not directed" at the craft. It does not refer to salvage rights or litigation activity. Section 1406(d), by contrast, stands on its own. It lacks any limiting language—like "directed at"—that mirrors or references section 1402. Nor does its text hint at some other clue that suggests that its bar on "salvage rights or awards" is limited to *in rem* actions.

An *amici curiae* brief, submitted by two law professors, argues that the Sunken Military Craft Act, as construed by the district court, is "unconstitutional" because it "removes claims under both the law of salvage and the law of finds from the purview of Article III courts." They urge us to construe the Act to allow for "*in personam* [salvage] remedies" to avoid these constitutional concerns.

We decline to consider the law professors' argument. We discern no ambiguity in section 1406(d), and "our adversarial system of adjudication" follows "the principle of party presentation." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). Under that principle, we rely on parties to litigation "to frame the issues for decision" and retain "the role of neutral arbiter of matters the parties present." *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022) (en banc) (citation and internal quotation marks omitted). Here, no party raised a constitutional objection in the district court or this Court. And although the *amici* challenge the constitutionality of the Act, as applied, their non-party brief does not cure the party-presentation defect. Unless "exceptional circumstances" are present, "amici curiae may not expand the scope of an appeal to implicate issues not presented by the parties to the district court." *Richardson v. Ala. State Bd. of Educ.*, 935 F.2d 1240, 1247 (11th Cir. 1991). No exceptional circumstance warrants departure from that rule here.

### 2. *La Trinité* Is a Sunken Military Craft.

Global Marine contends that the Sunken Military Craft Act's bar on salvage claims does not apply to *la Trinité* because the vessel was not engaged in "military noncommercial service when it sank." We disagree. France presented evidence that the vessel was so engaged, and Global Marine's experts failed to create a genuine dispute of fact about the ship's mission when it sank. The Sunken Military Craft Act defines "sunken military craft" to mean "any sunken . . . vessel that was owned or operated by a government on

military noncommercial service when it sank." § 1408(3)(A), 118 Stat. at 2098. No one disputes that France owned *la Trinité*. So we ask only whether *la Trinité* was "on military noncommercial service when it sank."

The undisputed record establishes that *la Trinité* was "on military noncommercial service when it sank." To be sure, Ribault was tasked with providing relief to Fort Caroline. To that end, he transported families, civilians, food, goods, livestock, and tradesmen to the settlement. But Ribault was also tasked with defending Fort Caroline from a potential Spanish attack. To that end, the French king armed him to the teeth with artillery and gave him around 500 French soldiers. And if we examine what *la Trinité* was doing "*when* it sank," the answer is clear. On its way to attack the Spanish fleet—a mission that can only be described as "military noncommercial service"—*la Trinité* sank in a storm. On that basis alone, the undisputed record supports France's position.

Global Marine unpersuasively argues that *la Trinité* was not engaged in military service because Ribault attacked the Spanish Fleet in defiance of King Charles IX's orders. Even if the Act allows us to consider whether Ribault defied the King's orders, nothing in the record supports this argument. The only evidence that even comes close is the statement of one passenger, cited in the report by James Sinclair, that King Charles IX "forbade [Ribault] from making a landfall in any other country or island, especially those which were under the dominion of the King of Spain." That statement, at most, confirms that Ribault had no license to attack

Spanish colonial lands. But it does nothing to undermine the evidence that Ribault was tasked with defending Fort Caroline from Spanish attack. And that defense was unquestionably "military noncommercial service."

Global Marine next maintains that the ships in Ribault's fleet were cargo ships, not military ships. But this argument misses the point of section 1408(3)(A). What matters is whether *la Trinité* was engaged in military noncommercial service when it sank. A cargo ship qualifies as a "sunken military craft" under the Act so long as it was "owned or operated by a government on military noncommercial service when it sank." § 1408(3)(A), 118 Stat. at 2098. Global Marine's assertion about Ribault's fleet, even if true, would not sway the outcome of this appeal.

B. *Global Marine's Common-Law Claims Fail as a Matter of Law.*

Global Marine argues that the district court erred when it granted summary judgment to France on its claims for unjust enrichment, trade-secret misappropriation, and interference. We take each claim in turn.

1. Global Marine's Unjust-Enrichment Claim Fails.

Global Marine argues that the district court erred when it granted summary judgment for France on its unjust-enrichment claim. It contends that "France took the benefit of [Global Marine]'s costs and risks with full knowledge that [Global Marine]'s services produced this benefit." And it accuses France of responding with "hauteur but no gratitude" when it accepted the

"windfall" of Global Marine's work. These arguments fail on the facts and on the law.

To succeed on an unjust-enrichment claim under Florida law, a plaintiff must prove three elements: (1) he "conferred a benefit on the defendant, who has knowledge thereof"; (2) the "defendant voluntarily accepts and retains the benefit conferred"; and (3) "the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Pincus v. Am. Traffic Sols., Inc.*, 333 So. 3d 1095, 1097 (Fla. 2022) (citation and internal quotation marks omitted). Put another way, "[w]here unjust enrichment is asserted, a party is liable for services rendered only when he requests the other party to perform the services or knowingly and voluntarily accepts their benefits." *Coffee Pot Plaza P'ship v. Arrow Air Conditioning & Refrigeration, Inc.*, 412 So. 2d 883, 884 (Fla. Dist. Ct. App. 1982).

The record contains no evidence that France requested Global Marine's services or that it knowingly and voluntarily accepted the benefits of Global Marine's efforts. Indeed, all signs from France would lead a reasonable party to conclude the opposite. Since 2004, France had publicly stated that it opposed any "intrusive action" directed at any French "warship, naval auxiliary [or] other vessel" without "the express consent of the French republic." 69 Fed. Reg. 5647 (Feb. 5, 2004). Then, in 2016, when Global Marine contacted France about the discovery of *la Trinité*, France refused the company's salvage services. Plus, far from "directly confer[ring] a benefit to [France]," as Global Marine must show to recover

under Florida law, *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017), Global Marine conducted its exploratory activity in the hopes of making a profit for itself. When those efforts failed, it brought a legal action, denied that it had located *la Trinité*, and even submitted an expert report contending that Global Marine "ha[d] not discovered a primary shipwreck site at all." *Global Marine I*, 348 F. Supp. 3d at 1234 n.8. No matter which way we look at it, Global Marine has failed to create a genuine dispute of fact that would warrant reversal for this claim.

2. Global Marine's Trade-Secret-Misappropriation Claim Fails.

Global Marine argues that the district court erred when it granted summary judgment for France on its misappropriation-of-trade-secrets claim. This claim proceeds under the Florida Uniform Trade Secrets Act. *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018). To prove liability under that Act, Global Marine must prove that "(1) it possessed a 'trade secret' and (2) the secret was misappropriated." *Id.* (citation and internal quotation marks omitted). Misappropriation occurs when a trade secret is acquired "by someone who knows or has reason to know that the secret was improperly obtained or who used improper means to obtain it." *Id.* (citation and internal quotation marks omitted).

No record evidence proves that France misappropriated the purported trade secrets—i.e., the "precise locations" of Global Marine's "discovered shipwreck sites"—in question. Global Marine's exploratory permit required the company to turn over "Survey

Log Sheets" with "topographic quadrangle maps" and "site loca-tions" to the Florida Department of State. FLA. ADMIN. CODE ANN. r. 1A-46.001 (2025). Global Marine may believe that the Florida De-partment of State, through "coercion and deception," "induced" it to turn over this location data. But that alleged coercion has noth-ing to do with France. And Global Marine failed to bring forth any evidence proving that France knew that the precise location data "was improperly obtained" or that France itself "used improper means to obtain it." *Yellowfin Yachts*, 898 F.3d at 1297 (citation and internal quotation marks omitted).

> 3. Global Marine's Tortious-Interference Claim Fails.

Global Marine argues that the district court erred when it granted summary judgment for France on its claim of tortious in-terference. More specifically, Global Marine contends that France interfered with Global Marine's "rights and business relations" with the Florida Department of State when France joined forces with the Department to explore and recover *la Trinité* and "the other shipwrecks" from Ribault's fleet. We disagree. Any interference was justified under Florida law.

To succeed on this claim, Global Marine must prove "(1) the existence of a business relationship[;] (2) knowledge of the relation-ship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (alteration adopted) (citation and internal quotation marks

omitted). The third element, most important here, requires the plaintiff to allege "that the defendant acted without justification." *Sec. Title Guarantee Corp. of Balt. v. McDill Columbus Corp.*, 543 So. 2d 852, 855 (Fla. Dist. Ct. App. 1989). A defendant does not act "without justification," *id.*, if he has "the privilege of interference." *Wackenhut Corp. v. Maimone*, 389 So. 2d 656, 658 (Fla. Dist. Ct. App. 1980).

Florida law provides a "protection privilege" against liability for tortious interference when a defendant "interfere[s] to protect [its] own financial and contractual interests." *Weisman v. S. Wine & Spirits of Am., Inc.*, 297 So. 3d 646, 651 (Fla. Dist. Ct. App. 2020) (citing *Salit v. Ruden, McClosky, Smith Schuster & Russell, P.A.*, 742 So. 2d 381 (Fla. Dist. Ct. App. 1999)). "To defend using this privilege requires only that the defendant show improper means were not employed." *Id.* "The burden to defeat the privilege then shifts to the party that brought the tortious interference claim to show improper means were employed." *Id.* Under the protection privilege, a defendant cannot be liable for tortious interference for "'doing no more than insisting upon existent legal rights in a permissive way.'" *Id.* (alteration adopted) (quoting *Horizons Rehab., Inc. v. Health Care & Ret. Corp.*, 810 So. 2d 958, 964 (Fla. Dist. Ct. App. 2002)). The "controlling principle is that so long as improper means are not employed, activities taken to safeguard or promote one's own financial [and contractual interests] are entirely non-actionable." *Sec. Title Guarantee Corp. of Balt.*, 543 So. 2d at 855 (citation and internal quotation marks omitted).

France's interference related to *la Trinité* was justified under the protection privilege because France did nothing more than protect its economic and financial interests in a permissive way. *See Weisman*, 297 So. 3d at 651. France established a relationship with the Florida Department of State and interfered (in the legal sense) in Global Marine's *in rem* action to protect its ownership of and sovereign interest in *la Trinité*. No evidence suggests that France protected its interests using improper means.

In response, Global Marine asks us to infer that France acted with a "malicious motive" because France and Florida's declaration of joint venture referred not only to *la Trinité* but also to other "sites within the state permit area previously awarded to" Global Marine. But the question under the protection privilege is whether France protected its rights without resorting to "improper means," *Weisman*, 297 So. 3d at 651, not whether France acted with a malicious motive. "[I]t is irrelevant whether the person who takes authorized steps to protect his own [economic] interests does so while also harboring some personal malice or ill-will towards the plaintiff." *Ethyl Corp. v. Balter,* 386 So. 2d 1220, 1225 (Fla. Dist. Ct. App. 1980) (citing *Chipley v. Atkinson*, 1 So. 934, 938 (Fla. 1887)).

The declaration of joint venture does not suggest that France acted improperly. The declaration outlines France's and Florida's intent to "[p]rotect the archeological site off the coast of Cape Canaveral, State of Florida, where the shipwreck of the *Trinité* and of other vessels from its fleet are located." It also describes efforts to study and preserve the "vestiges of the *Trinité*,

which will include in particular the study and recovery of the ship-wreck of the *Trinité* and of the other shipwrecks from its fleet and the related activities aiming to identify, preserve and commemo-rate this heritage." The declaration establishes that France and Florida plan to search for other ships from Ribault's fleet, but it makes no mention of the five additional sites identified in Global Marine's reports.

This omission makes sense. As Global Marine points out, there is little evidence that the five other sites contained shipwrecks of the French fleet. At a hearing, France's legal representative agreed with Global Marine on that point. He stated, the "record . . . show[s] that *la Trinité* is the only one of the Ribault fleet ships that was driven that far south. The others are somewhere to the north remaining to be found." He also clarified that France did not "make any claim as to those other[]" five sites.

France's lawful financial and contractual interests in recover-ing the other ships in Ribault's fleet are the same as its interests in recovering *la Trinité*. No evidence proves that France, in pursuit of these lawful interests, interfered with the five other sites identified by Global Marine in its reports. Global Marine's drive-by request for an inference of "malicious motive" in its favor does not create a genuine dispute of material fact.

Moreover, though Global Marine faults France for the de-mise of its "business relations" with Florida, the record establishes that Global Marine's own conduct caused the fallout. "Imbedded within" the elements of tortious interference "is the requirement

that the plaintiff establish that the defendant's conduct caused or induced the breach that resulted in the plaintiff's damages." *Chi. Title Ins. v. Alday–Donalson Title Co. of Fla.*, 832 So. 2d 810, 814 (Fla. Dist. Ct. App. 2002). When Global Marine filed its *in rem* suit, it presented to the district court "3 cannon balls, 3 ballast stones, [and] one pick head" recovered from the site of *la Trinité*. Florida determined that those artifacts "were illegally recovered in violation of" Global Marine's permit. Florida then suspended the permit and later revoked it because Global Marine failed to "return the artifacts." Missing from this chain of causation is any evidence pointing to French interference. Instead, Global Marine's actions caused Florida to revoke its permit and deny its "application for recovery of materials in the permit area."

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of France.

24-10148    WILLIAM PRYOR, C.J., Concurring    1

WILLIAM PRYOR, Chief Judge, concurring:

I write separately to offer a comment about the initial and reply briefs filed by the *amici curiae*, Associate Professor of Law Annie Brett and Staff Attorney and Fellow Ryan L. Scott of the University of Florida, regarding the Sunken Military Craft Act. *See* Pub. L. No. 108-375, §§ 1401–08, 118 Stat. 1811, 2094–98 (2004) (codified at 10 U.S.C. § 113 note). The *amici* contend that the Act, as we and the district court have interpreted its plain text, is "likely unconstitutional as an impermissible repudiation of the federal courts['] admiralty and maritime jurisdiction." *See* U.S. CONST. art. III, § 2. Although the panel properly declines to address this argument because no party raised it either in the district court or on appeal, our silence should not be understood as implying that it has potential merit. The argument is, at best, dubious.

The *amici* maintain that the Act, as we have construed it, unconstitutionally "removes claims under both the law of salvage and the law of finds" from admiralty jurisdiction. They contend that because those claims have historically been allowed "against both sunken and floating military craft," Congress cannot remove any *in personam* claims for salvage from admiralty jurisdiction. And in support of that novel argument, they rely on the following often repeated but obscure passage from *Panama Railroad Co. v. Johnson*: "[T]here are boundaries to the maritime law and admiralty jurisdiction which inhere in those subjects and cannot be altered by legislation, as by excluding a thing falling clearly within them or including a thing falling clearly without." 264 U.S. 375, 386 (1924).

2          WILLIAM PRYOR, C.J., Concurring          24-10148

Their argument, if meritorious, would also cast doubt on the constitutionality of the Abandoned Shipwreck Act of 1987, 43 U.S.C. §§ 2101–06, which likewise provides that the laws of salvage and finds "shall not apply to abandoned shipwrecks" in United States waters, *id.* §§ 2105(a), 2106(a). The issue is important: "An estimated fifty thousand shipwrecks lie in the territorial waters of the United States." Russell G. Murphy, *The Abandoned Shipwreck Act of 1987 in the New Millennium: Incentives to High Tech Piracy?*, 8 OCEAN & COASTAL L.J. 167, 167 (2002).

Respectfully, the *amici* misunderstand the breadth of congressional power to "alter, qualify or supplement" maritime law and jurisdiction. *Panama R.R. Co.*, 264 U.S. at 386. As the Supreme Court also stated in *Panama Railroad*, "[T]here is no room to doubt that the power of Congress extends to the entire subject and permits of the exercise of a wide discretion." *Id.* Indeed, several years earlier, the Court declared "as settled doctrine" that "Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country." *S. Pac. Co. v. Jensen*, 244 U.S. 205, 215 (1917). And as for the broad grant of admiralty jurisdiction to the federal courts, U.S. CONST. art. III, § 2, the Court later explained, "There is *nothing* in that grant of jurisdiction—which sanctioned our adoption of the system of maritime law—to preclude Congress from modifying or supplementing the rules of that law as experience or changing conditions may require." *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 40–41 (1943) (emphasis added). Indeed, Supreme Court precedents on this point lead the authors of one respected treatise "irresistibly" to conclude "that,

24-10148          WILLIAM PRYOR, C.J., Concurring          3

while limitations do exist in theory, it is difficult to envisage circumstances which would call for any maritime legislation undertaken by the Congress, conforming to adequate standards of harmony of a national system, to be struck down by the courts." 1 BENEDICT ON ADMIRALTY § 110 (2025). Of course, Congress too enjoys plenary power to define the jurisdiction of the inferior courts that it creates. U.S. CONST. art. III, § 1; *Lockerty v. Phillips*, 319 U.S. 182, 187 (1943) ("The Congressional power to ordain and establish inferior courts includes the power . . . 'of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good.'" (quoting *Cary v. Curtis*, 44 U.S. (3 How.) 236, 245 (1845))); *Kline v. Burke Constr. Co.*, 260 U.S. 226, 234 (1922) (declaring that jurisdiction "conferred may, at the will of Congress, be taken away in whole or in part"); *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850) (stating that "Congress may withhold from any court of its creation jurisdiction" over any cases or controversies).

To be sure, some scholars debate whether the general maritime law should preempt state law after the demise of "federal general common law" in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("There is no federal general common law."). *Compare* Ernest A. Young, *Preemption at Sea*, 67 GEO. WASH. L. REV. 273, 275, 277 (1999) (proposing that after *Erie* "there should be no special preemption doctrine in admiralty"), *and* Bradford R. Clark, *Federal Common Law: A Structural Reinterpretation*, 144 U. PA. L. REV. 1245, 1332–60 (1996) (critiquing the preemptive nature of general maritime law for private claims), *with* Robert Force, *An Essay on Federal*

*Common Law and Admiralty*, 43 ST. LOUIS U. L.J. 1367, 1367–68, 1377–82 (1999) (defending the doctrine of general maritime law preempting state law). The critics of treating general maritime law as federal law contend that "preemption is extremely difficult to justify in the absence of legislative action." Young, *supra*, at 277. *But see* Force, *supra*, at 1380 ("If the Supreme Court applied the *Erie* rationale to the general maritime law tomorrow, assuredly there would be chaos."). Yet both critics and defenders alike acknowledge the constitutionality and supremacy of federal maritime legislation. *See, e.g.*, Clark, *supra*, at 1259 (arguing that "the Court must point to some source, such as a statute, treaty, or constitutional provision, as authority for the creation of substantive federal law"); Force, *supra*, at 1377 ("When Congress enacts maritime legislation under the Commerce Clause or some other express power, there is no question that conflicting state law must yield to the Supremacy Clause.").

The breadth of the discretion of Congress to define the maritime law for sunken military craft must also be understood in the light of its other enumerated powers. The Constitution grants Congress several powers to effect the alteration of substantive maritime law made by section 1402(b), 118 Stat. at 2095 (providing that "[n]o person may possess, disturb, remove, or injure any sunken military craft," ancient or modern and domestic or foreign, except as otherwise permitted), and section 1406(d), 118 Stat. at 2097 (preempting the ordinary laws of salvage and finds for those craft), of the Act. These powers include the power "[t]o regulate Commerce with foreign Nations, and among the several States"; "[t]o

24-10148         WILLIAM PRYOR, C.J., Concurring         5

define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations"; "[t]o declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water"; "[t]o provide and maintain a Navy"; "[t]o make Rules for the Government and Regulation of the land and naval Forces"; and "[t]o make all Laws which shall be necessary and proper for carrying into execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States." U.S. CONST. art. I, § 8. Moreover, the Constitution grants Congress, among its "other Powers," *id.*, the authority "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," *id.* art. IV, § 3.

Any sunken military craft carries enormous significance to a nation. *See* Guidelines for Permitting Archaeological Investigations and Other Activities Directed at Sunken Military Craft and Terrestrial Military Craft Under the Jurisdiction of the Department of the Navy, 80 Fed. Reg. 52588, 52588 (Aug. 31, 2015) (codified at 32 C.F.R. § 767). For the sailors, pilots, or soldiers who drowned, the craft serves as a graveyard and a memorial to their service. *Id.* Its remaining ordnance represents a threat to public safety. *Id.* Its fuels, chemicals, or hazardous substances may cause environmental pollution. *Id.* An ancient craft will likely hold historical and cultural value for the nation that operated it. *Id.* And a modern craft may contain sensitive technologies and military secrets. *Id.*

6                    WILLIAM PRYOR, C.J., Concurring          24-10148

The federal interests in preempting the general maritime laws of salvage and finds for sunken military craft and establishing a modern uniform law on this subject are easy to comprehend. When Congress enacted, and President George W. Bush signed, this law as part of the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, 118 Stat. 1811 (2004), it permitted the federal government to protect not only its sunken military craft but also to promote our foreign relations and national security by respecting the military craft of other nations. 80 Fed. Reg. at 52589 ("As more than half of [the Navy's] sunken military craft rest beyond U.S. waters, the U.S. government has an interest in reaching understandings or agreements with foreign nations, . . . seeking assurances that U.S. sunken military craft will be respected and protected[,] and offering foreign nations reciprocal treatment."). The Act preserves title to our sunken military craft regardless of location or age, § 1401, 118 Stat. at 2094, and it protects any foreign military craft in United States waters from private disturbance, §§ 1402(a)–(b), 1408(3), 118 Stat. at 2094–95, 2098. It covers not only naval vessels but also sunken aircraft and spacecraft. § 1408(3)(B), 118 Stat. at 2098.

Contrary to the argument of the *amici* scholars, the Sunken Military Craft Act does not "remove[]" a maritime subject from its jurisdiction within the meaning of *Panama Railroad*. That is, it does not treat a maritime subject as the province of local law. It instead supplants general law derived from the ancient law of nations, *see, e.g.,* 1 EMER DE VATTEL, THE LAW OF NATIONS § 293, at 256 (Béla Kapossy & Richard Whatmore eds., Liberty Fund, Inc. 2008) (1758)

24-10148          WILLIAM PRYOR, C.J., Concurring          7

(describing "the right to wrecks" in the law of the sea); *see generally* ANTHONY J. BELLIA JR. & BRADFORD R. CLARK, THE LAW OF NATIONS AND THE UNITED STATES CONSTITUTION 41–134 (2017) (recounting the development of the law of state-state relations and the law maritime in relation to the Constitution), and fashions new uniform rules of maritime law for the changed conditions of our modern nation.

The Act creates a new regime for the salvage of a sunken military craft within admiralty jurisdiction. Under sections 1406(d)(1) and (2), 118 Stat. at 2097, a salvor must have "the express permission" of the nation that owns the craft to exercise any rights of salvage or to obtain an award of salvage. Sections 1404 and 1405, 118 Stat. at 2095–96, give the United States the authority to enforce the Act through steep civil penalties for violations and to obtain enforcement costs and damages for any injury. Section 1404(d), 118 Stat. at 2096, creates *in rem* liability for any vessel used to violate the Act. *See Am. Dredging Co. v. Miller*, 510 U.S. 443, 446–47 (1994) ("An *in rem* suit against a vessel is . . . distinctively an admiralty proceeding, and is hence within the exclusive province of federal courts."). And section 1406(f), 118 Stat. at 2097, excepts any violator of the Act from the benefit of the Limitation of Liability Act. *See* 46 U.S.C. §§ 30501–30.

Under the Act, the subject of ownership and recovery of sunken military craft remains both federal and maritime even as its substantive rules have been altered. Not surprisingly, when it sued *la Trinité* in its *in rem* action in the Middle District of Florida, Global

Marine invoked maritime jurisdiction, 28 U.S.C. § 1333. *See* Complaint at 2, *Glob. Marine Expl., Inc. v. The Unidentified Wrecked & (for Finders-Right Purposes) Abandoned Sailing Vessel*, 348 F. Supp. 3d 1221 (M.D. Fla. 2018) (No. 6:16-cv-1742-Orl-KRS). And when it sued France in this *in personam* action, it alleged that it sought to enforce a "maritime lien under federal admiralty law." The jurisdictional issues that later arose in both cases involved foreign sovereign immunity, *not* any question about admiralty jurisdiction. The subject of this controversy—a vessel in navigable waters—remains, of course, the province of maritime law. *See generally* 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW §§ 3.3, 3.6 (6th ed. 2024) (explaining the importance of location and vessel status in determining jurisdiction); 1 BENEDICT, *supra*, § 106 (same). But Congress changed the substantive maritime law of salvage rights for sunken military craft, and under the Act, Global Marine enjoys no salvage rights. Congress knew what it was doing when it enacted this law. And under the Constitution, we are duty-bound to respect its judgment on this matter.